ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.*

WEBSTER.

Opinion delivered April 17, 1911.

1. CONTINUANCE—DISCRETION OF COURT.—Under the rule that the granting or refusing of continuances is a matter of discretion, it was not error to refuse a continuance, in a suit for personal injuries received by a railway brakeman in attempting to climb on a box car, which was asked in order to enable defendant to obtain testimony as to the condition of the car, when, immediately after the accident, defendant's attention was called to such car, and it had opportunity to inspect same. (Page 270.)

2. DEPOSITIONS—STATUTORY FORMALITIES—WAIVER.—The parties to an action may verbally waive the statutory formalities as to having the deposition of witnesses reduced to writing in the presence of several witnesses, and signed by them, and in transmitting the deposition to the clerk of the court. (Page 271.)

3. SAME—PAROL WAIVER OF FORMALITIES.—The fact that the parties to an action, in taking depositions, agreed in writing that all objections and exceptions to any part of direct or cross examinations of certain witnesses might be made and submitted to the court when the depositions were offered will not preclude proof of another and verbal agreement waiving certain statutory formalities in the taking of such depositions. (Page 272.)

4. SAME—HOW WAIVER PROVED.—The act of May 11, 1905, relating to depositions, which provides that if the signature of a witness "is waived by the parties the officer before whom the same is taken must so certify," does not exclude other proof of such waiver. (Page 273.)

5. MASTER AND SERVANT—DEFECTIVE APPLIANCES.—In an action to recover for injuries to a servant caused by a master's negligence, it is not sufficient to show that the servant was injured by defective machinery, but the evidence must establish that the injury happened because the master did not exercise proper care in the premises. (Page 273.)

6. SAME—DEFECTIVE APPLIANCES.—Where there was evidence that a hand-hold on a box car was attached by screws to rotten wood, and that plaintiff was injured by reason of the screws pulling out, the question whether the master was negligent in failing to discover the condition of the hand-hold was properly left to the jury. (Page 274.)

7. SAME—DUTY OF MASTER TO MAKE INSPECTION.—The rule that the master is required to inspect appliances to discover and repair latent as well as patent defects, and that the servant is only required to look for patent defects, applies to foreign cars taken into a train as well as to cars owned by the defendant. (Page 276.)

8. SAME—DUTY OF SERVANT TO INSPECT APPLIANCES.—A rule of defendant railway company that its trainmen must examine and know for them-

selves that the appliances which they are to use are in proper condition means that such trainmen must make only such cursory inspection as will discover defects open to ordinary inspection. (Page 277.)

9. SAME—DUTY OF SERVANT TO MAKE INSPECTION—INSTRUCTION.—An instruction to the effect that if plaintiff knew that the place at which he was injured was not a point at which the defendant kept an inspector, and plaintiff assumed the duty of inspecting in such case, he could not recover was properly refused where there was no proof that the place of injury was not an inspection point. (Page 278.)

10. SAME—MASTER'S RULE—NOTICE TO SERVANT.—A servant is not bound by a rule of which he had no actual notice and which is not shown to have been in force long enough to justify an inference that he had notice of it. (Page 279.)

11. DAMAGES—PERSONAL INJURIES—EXCESSIVENESS.—Where a brakeman, 35 years old, in good health and earning $79 per month, was injured by the master's negligence, which resulted in great pain, which would continue for the rest of his life, and caused him to suffer curvature of the spine, with the loss of sexual power and of the ability to work, a verdict of $35,000 will not be set aside as excessive. (Page 280.)

Appeal from Crawford Circuit Court; *Jeptha H. Evans,* Judge; affirmed.

*W. E. Hemingway* and *Lovick P. Miles,* for appellant.

1. The court erred in refusing to grant a continuance. 66 Ark. 278; 59 Ark. 169; Pomeroy, Rem. Rights, § 554; 75 Ark. 369, 372; 74 Ark. 159; 85 Ark. 334; 67 Ark. 142.

2. The depositions of Doctors Bentley and Barlow should have been suppressed.

3. The evidence was not sufficient to sustain a verdict against appellant. The burden was on appellee to show negligence, *i. e.,* the want of reasonable care and diligence on the part of appellant with reference to the hand hold, and this burden was not shifted by proof of the injury. On the contrary, the appellant is presumed to have done its duty by furnishing safe and suitable appliances for the performance of the work. If there is proof that the appliances were defective, there remains the further presumption that appellant was not negligently ignorant of it and had no notice of it. 44 Ark. 529; 46 Ark. 555; 79 Ark. 437. See also 88 Ark. 181; 87 Ark. 451; 82 Ark. 372; 79 Ark. 437; 93 Ark. 566; 26 Pac. 297; 82 N. W. 467.

4. The court erred in giving its instruction 5 and in refusing to give instruction 6 requested by appellant.    50 Ark. 549; 96 Ark. 206.

5. The verdict is excessive.    Although appellee had been 13 years in railroad service, his highest monthly earnings was $79.00, an annual income of $948. Assuming that he was totally incapacitated for any kind of renumerative occupation, which is not borne out by the evidence, and that his expectancy was 35 years, the amount of the verdict $35,000.00 at 6 per cent. would earn $2,100.00 per year, $1,152.00 more than the total of his highest monthly wages, and at the conclusion of his expectancy, assuming that the total amount of interest had been spent, there would remain an accumulation of $1,000.00 for each year of the remainder of his life.    In such cases as this compensation "must be considered upon a reasonable basis of estimation."    89 Ark. 522; 57 Ark. 386.

*Jeff Davis* and *Frank Pace,* for appellee.

1. The court properly overruled the motion for continuance. There was no abuse of discretion.    24 Ark. 599; 22 Ark. 164; 26 Ark. 323; 40 Ark. 114; 19 Ark. 92; 2 Ark. 33; 72 Ark. 614; 76 Ark. 173; 93 Ark. 120; *Id.* 347; 94 Ark. 538.

2. The depositions of Drs. Bentley and Barlow should not have been suppressed.    The court heard the evidence with reference to the oral agreement of counsel, and found that it was agreed that all formalities with reference to the taking and transmission of the depositions were waived.

3. The evidence was sufficient to sustain a verdict.    The presumption that the master has done his duty by furnishing safe and suitable appliances to the servant for the performance of his work is met in this case by the fact, shown in evidence, that the injury was the result of the defective condition of the grab-iron.    And the second presumption, that the master had no notice of the defect or was not negligently ignorant of it, is met by evidence which shows conclusively that the appellant either knew of the defect or was negligently ignorant of it.    "The duty of inspection is affirmative, and must be continuously fulfilled and positively performed."    92 Ark. 355, 357; 66 Vt. 331; 149 U. S. 368; 152 U. S. 684; 4 Thompson on Neg., § 3803c; 1 Labatt, Master & Servant, § § 155-157; 67 Ark. 295; 82 Ark.

372; 138 Mass. 426; 87 Ark. 451; *Id.* 474; 88 Ark. 184; 91 Ark. 391; *Id.* 349; 92 Ark. 559; 93 Ark. 566; 54 Wis. 257; 82 N. W. 637; 37 C. C. A. 6; 7 N. W. 347; 43 S. W. 1090.

4. There was no error in the 5th instruction given. 48 Ark. 333; 67 Ark. 307; 157 U. S. 72; 116 N. Y. 398. And the sixth instruction requested by appellant is not the law. Rules of the company not brought to the knowledge of the servant do not bind him. 48 Ark. 433. See also 163 N. Y. 396; 44 App. Div. (N. Y.) 11.

5. The verdict is not excessive.

McCulloch, C. J. The plaintiff, R. W. Webster, claims to have received personal injuries while in the service of the defendant, the St. Louis, Iron Mountain & Southern Railway Company, as brakeman, and sues to recover damages, alleging that his injuries were caused by the negligence of the defendant in failing to exercise ordinary care to discover and repair an insecure handhold or grabiron on the top of one of the freight cars in the train which plaintiff was handling. He claims that the grabiron gave way under his grasp, and that he fell to the ground, receiving severe injuries on account of the fall from the moving train. This occurred on January 10, 1910, near Bryant, a station south of Little Rock on defendant's main line, and only a few miles from the junction with the Bauxite & Northern railroad, which is a short line running from defendant's main line, a distance of a mile and a half or two miles to Bauxite, a station on the Chicago, Rock Island & Pacific Railway, where there is situated a large plant for the reduction of bauxite ore. The car in question was loaded with ore for shipment to East St. Louis, and plaintiff and another brakeman assisted in switching it into their train from the track of the Bauxite & Northern Railroad, on which it had been brought from the reduction plant. The junction of the Bauxite & Northern Railroad with defendant's line is spoken of by the witnesses as "Bauxite," but the village or railroad station of that name is, as before stated, on the line of the Chicago, Rock Island & Pacific Railway Company. This action was instituted in the circuit court of Crawford County May 5, 1910. In the complaint it was alleged that on the 10th day of January, 1910, plaintiff "was in the employ of defendant as brakeman on a

freight train, and as such was assisting in running a train over the tracks of the defendant's railway between Malvern and Little Rock, Arkansas, and that as said train was leaving the station of Bryant plaintiff, in the performance of his duty and exercising due care on his part, was boarding a box-car in said train, and, while so engaged, took hold of a grab-iron on top of said car, and that said grab-iron pulled loose from said car, causing plaintiff to fall with great force," etc.   Continuing, it was alleged that defendant "carelessly and negligently permitted said grab-iron on said car to become loose and unsafe and the fastenings thereof to become weak and imperfect, unsound and unsafe, and that this fact was known to the defendant, or could have been known by reasonable inspection, and was unknown to plaintiff," etc.

On June 25, 1910, defendant filed in the office of the clerk of the Crawford Circuit Court a motion to require the plaintiff to make his complaint more definite and certain by setting forth therein a specification of the particular train on which he was working when injured, whether it was a local or through train, what direction it was going, the number and initials of the car upon which the alleged insecure grab-iron was situated, and the time of day or night when the injury occurred.   A copy of this motion was delivered to plaintiff's counsel on the day it was filed, and on June 30, 1910, the day of trial, plaintiff amended his complaint by stating that the train in question was the "only local freight train that ran daily between Little Rock and Malvern;" that same was going toward Little Rock, and that plaintiff had "no personal knowledge of the number of said car, but that, after the accident, he was informed by those in charge of the train, Mr. Farabee, the conductor, and Mr. Eddy, a brakeman, that the number of same was 350,142 and the initials 'C., R. I. & M.'"   Defendant thereupon filed its answer, denying all the material allegations of negligence, and pleaded contributory negligence and assumption of the risk on the part of the plaintiff.   Defendant also filed a motion for a continuance, to enable it to prepare for defense by obtaining testimony as to the movements of the car in question prior to the accident. "the age of the car, place and manner of construction, when the several grab-irons thereon were applied, and who applied

them," as to the inspection of the car immediately prior to the accident on defendant's line, or on foreign lines, when and how made and by whom, etc., the condition of the grab-irons on said car at the time of the accident, etc. The motion then proceeds as follows:

"4. If it should appear that the car now named in the complaint was not the one from which plaintiff fell, then defendant must, in order to maintain its defense, present evidence along each of the lines hereinbefore mentioned with respect to each car in the train upon which plaintiff was laboring at the time of his injury.

"5. The defendant has not completed an investigation either with respect to the specific car named or to the cars in said train, nor has it been possible since the filing of this complaint. The evidence which defendant has not now, but which it can procure if this cause is continued, will, it verily believes, acquit the defendant of any actionable negligence. The evidence hereinbefore detailed, which is material, is not wanting at the present time through the consent, connivance or procurement of the defendant."

The court overruled the motion and recited in the order a finding that it was "conceded that defendant was informed, on the date the accident occurred and immediately thereafter, by both the plaintiff and his fellow-employees on the train, that the car from which the grab-iron was said to have pulled, and from which the plaintiff was said to have fallen, was the car 'C., R. I. & M. 350,142' in the train set out in the complaint as amended."

A trial of the case resulted in a verdict in favor of plaintiff, assessing his damages in the sum of $35,000.

The court's refusal to grant a continuance is made the basis of the first assignment of error pressed upon our attention. It must be conceded now that the defendant knew, immediately after the accident, as much as plaintiff knew, and more, concerning the description of the train and of the particular car on which the alleged insecure grab-iron was situated. The court, on the hearing of the motion for continuance, found this to be so, and the evidence adduced at the trial of the case showed that immediately after plaintiff's injury he and his fellow employees

made report to their superiors in service, giving the particulars as to the injury, the number and initials of the car, etc. Moreover, the evidence in the case shows that the superintendent of the road boarded the train a short time after the injury and received full information about the details of the accident. With this information in its possession at the time of the institution of the action, defendant ought to have been able to prepare for trial. But counsel insist that, notwithstanding the information in defendant's possession, they were entitled to have a specification in the complaint of the particular car on which the insecure grab-iron was located before they could be held to be in default for not preparing for trial. They say that the car in question was a "foreign" car, that is, a car which belonged to some other railroad company, that it was very expensive to trace it and get information concerning its condition, the inspections thereof, etc., and that, if defendant had proceeded with an investigation before the complaint was made to specify the particular car, the plaintiff might have adduced testimony tending to identify some other car as the one which caused the injury, thus rendering the investigation futile and leaving defendant in a state of unpreparedness after having pursued a useless and expensive investigation. The answer to this is that no such situation is presented for the court to deal with. Defendant had no right to assume that plaintiff would shift his position in the case by attempting to prove a defect in some car other than the one which he and his fellow-employees had reported as the car which caused the injury. If plaintiff, when required to make his complaint more definite, had specified some other car, then defendant should have been given time to prepare its defense as to negligence with regard to it, but such is not the state of this case. Plaintiff specified the car which defendant had known all the time was the one which was claimed to be defective. The question of granting or refusing a continuance is, ordinarily, a matter of discretion in the trial court, and this court will not disturb a ruling of the trial court in such matter unless an abuse of the discretion appears. We think that in this instance the trial court's discretion was fairly exercised, and no abuse thereof is shown.

Defendant moved to suppress the depositions of certain witnesses on the ground that the statutory formalities were not

observed in having the testimony reduced to writing in the presence of the several witnesses, and signed by them, and in transmitting the depositions to the clerk of the circuit court. Plaintiff responded that these formalities were expressly waived by defendant's attorney, who was present at the examination of the witnesses. The court heard testimony and found that defendant's attorney waived these formalities by an oral agreement. There is testimony to sustain the finding of the court on that issue, and we will not disturb it. These statutory formalities are for the benefit of the parties to litigation, to safeguard the integrity of depositions, but the parties may waive them by mutual agreement, either oral or in writing. They may waive the presence of a witness and agree upon the testimony, or they may waive the oath of a witness, or agree upon any vehicle they may choose for the transmission of the depositon. Counsel contend, however, that there was a written agreement entered into during the progress of the examination of the witnesses, and that the said agreement did not cover points of objection now urged. It is true that, during the examination of one of the witnesses, the attorneys reduced to writing a stipulation that as to all notations of objections and exceptions not made before the notary "all objections and exceptions to any part of direct or cross examinations may be made and submitted to the court when the deposition is offered." This did not cover the question as to the formalities in taking or transmitting the depositions, which, according to the evidence adduced on the motion to suppress, was the subject of a prior oral agreement. No rule of evidence was violated in permitting the oral agreement to be proved, for it did not vary, contradict or enlarge the written agreement, which covered another subject.

Authorities are cited to the effect that oral stipulations of counsel made out of court will not be enforced, but this is where a statute or rule of court requires them to be in writing, or where the court in which the stipulation is sought to be enforced adopts a policy of ignoring stipulations not in writing. None of the cases go to the extent of holding that, where a trial court enforces an oral agreement with respect to waiver of formalities in taking testimony, it constitutes reversible error. In the absence of a statute or rule of court, such oral stipulations

may be enforced, and where the parties have acted on a stipulation and carried the same into effect, it is the duty of the court to hold it to be binding. 36 Cyclopedia of Law, pp. 1282-1284; *Chamberlain* v. *Fitch*, 2 Cowen (N. Y.) 243; Ex parte *Pearson*, 79 S. C. 306.

Here the plaintiff relied on the alleged agreement, and all the formalities in regard to taking and transmitting the depositions were disregarded. No objection to the depositions was offered until the case was called for trial, and it would have been unjust to permit a repudiation of the alleged agreement, which would necessarily have resulted in postponing the case to allow time for taking the depositions over again.

It is also insisted that the alleged oral waiver of the signatures of the deponents must be disregarded because of the provision of the act of May 11, 1905, relating to depositions, that "if the signature is waived by the parties the officer before whom the same is taken must so certify." The fact that the statute makes it the duty of the officer to certify the waiver does not exclude other evidence of such waiver. The certificate of the officer is only *prima facie* evidence of the waiver. Ex parte *Miller,* 49 Ark. 18; *Davis* v. *Semmes*, 51 Ark. 48; *Fakes* v. *Wilder*, 70 Ark. 449.

The next contention of the defendant is that the evidence does not sustain the verdict in that it fails to show that the condition of the grab-iron before the accident was such that its frailty could have been discovered by diligent inspection. Plaintiff testified that he climbed up the ladder on the end of the car, and grasped the grab-iron on top first with his left hand, trying it to see that it was not loose, and that when he grasped it with his other hand and put his weight on it, the screw in one end came out, letting the iron swing loose at one end, and he fell to the ground. An examination shortly afterwards disclosed the fact that there were three screw holes from which the grab-iron had been shifted, and that the wood appeared to be rotten, the screws which came out having blackened and rotted wood in the threads. The roof of the car was covered with tin, and the wood underneath the tin could not be seen except at the screw holes. The law applicable to a case of this kind was stated by Chief Justice COCKRILL in the opinion in *St. Louis, I. M. & S.Ry.Co.* v. *Harper*, 44 Ark. 529, as follows:

"When an injury has occurred to a servant in consequence of a defect in machinery furnished by the master, to warrant a recovery the servant must show negligence or the want of care and diligence on the part of the master in relation to the defect. The *onus* of proof is not shifted to the master, as in the case of a passenger injured by a common carrier, by proof of the fact that an injury has resulted from the defect."

The following statement is also given in another decision of this court:

"The presumption is that the master has done his duty by furnishing safe and suitable appliances for the performance of his work. And when this is overcome by positive proof that the appliances were defective, the plaintiff is met by a further presumption that the master had no notice of the defect and was not negligently ignorant of it. It is not sufficient to show that the plaintiff was injured, and that the injury resulted from a defect in the machinery; but he must go further and establish the fact that the injury happened because the master did not exercise proper care in the premises." *St. Louis, I. M. & S. Ry. Co.* v. *Gaines,* 46 Ark. 555.

In a recent case, somewhat similar to this, we said:

"The evidence must have affirmatively established four elements of the plaintiff's cause of action before a recovery can be sustained, viz:

(a)    That the ladder was defective.

(b)    That the defect was unknown to the plaintiff.

(c)    That the defect was known to the defendant, or should have been known by it in the exercise of reasonable care.

(d)    That the defect caused plaintiff's injuries." *St. Louis, I. M. & S. Ry. Co.* v. *Andrews,* 79 Ark. 437.

We think that, without violating the rule stated in those cases, the conditions found to exist after the grab-iron gave way were such as to warrant a finding by the jury that they should have been discovered before then by reasonably diligent inspection. The wood was rotten, and the condition of the old screw holes indicated that the grab-iron had been shifted on account of the rotten wood. The covering of tin obscured a view of the wood, but this called for a more rigid inspection by testing the strength of the grab-iron. There is no testimony that an inspec-

tion had been made at all, but it is a reasonable inference that if an inspector had tested the strength of the grab-iron by throwing enough weight on it to ascertain whether it would bear a man's weight in ordinary use, it would have given way. It cannot be laid down as a rule of law that where there is a duty of inspection this may be discharged by reliance entirely on external appearances.

"Whether or not the duty of a master with regard to proper inspection has been performed by the application of any given test is to be determined by considering whether that test will give indications as to the actual condition of the instrumentality in question. In the application of this principle the courts have usually proceeded upon the theory that a merely visual or ocular inspection of external conditions does not satisfy the full measure of a master's obligations where the servant's safety depends upon the soundness of the material of which an instrumentality is composed, or upon the firmness with which the separate parts of an instrumentality are attached to each other." 1 Labatt on Master & Servant, § 161.

Nor can physical laws with respect to the natural decay from age and exposure be disregarded in determining the question of sufficiency of inspection. Length of time the appliance has apparently been in use may be considered. 1 Labatt on Master & Servant, § 159; *Campbell* v. *L. & N. R. Co.,* 109 Ala. 520.

We think the evidence was sufficient to show a defect which should have been discovered by reasonably diligent inspection. The following cases sustain that view: *St. Louis & S. F. Rd. Co.* v. *Wells,* 82 Ark. 372; *Ultima Thule, A. & M. R. Rd. Co.* v. *Calhoun,* 83 Ark. 318; *Kansas City S. Ry. Co.* v. *Henrie,* 87 Ark. 451; *Mammoth Vein Coal Co.* v. *Looper,* 87 Ark. 217; *St. Louis, I. M. & S. Ry. Co.* v. *Holmes,* 88 Ark. 181; *St. Louis S. W. Ry. Co.* v. *Lewis,* 91 Ark. 349; *St. Louis, I. M. & S. Ry. Co.* v. *Reed,* 92 Ark. 357; *St Louis, I. M. & S. Ry. Co.* v. *Rogers,* 93 Ark. 566.

The question was one for the jury, as different minds may reasonably reach different conclusions as to whether or not the defect was a discoverable one.

Error of the court is assigned in giving instruction No. 5

and in refusing to give defendant's instruction No. 6.    These instructions are as follows:

"V.    The plaintiff is required to use ordinary care for his own safety, but this does not include inspection of the cars and appliances for defects; that duty being upon the defendant, and the law permitting the plaintiff to rely upon the defendant for the performance of that duty for his safety.    The plaintiff is only required, in the exercise of ordinary care, to take notice of such defects and dangers as are patent to ordinary observation without the inspection which the law requires at the hands of the defendant.

"VI.    If plaintiff knew that Bryant was not a point at which defendant kept an inspector, and plaintiff, either in entering or remaining in the service of the defendant, has assumed the duty of inspecting or seeing for himself at such a point that the grab-irons on cars delivered there to defendant by another line were safe, and failed to do so, but attempted to use the grab-iron without ascertaining whether it was safe or not, and fell and was injured, your verdict should be for the defendant."

The fifth instruction, above quoted, which the court gave, states the well-settled rule of law as to relative duties of master and servant, that is, that it is incumbent on the former to inspect for the purpose of discovering and repairing defective appliances with which the servant is to perform the work, and that the latter is only required to look for patent defects which are open to ordinary observation.    This applies to foreign cars taken into a train as well as cars owned by the defendant.    1 Labatt on Master & Servant, § 174; 2 Labatt on Master & Servant, § 584; 3 Elliott on Railroads, § 1279; *Texas & P. Rd. Co.* v. *Archibald,* 170 U. S. 665; *Dooner* v. *D. & H. Canal Co.,* 164 Pa. 17.

In *Texas & P. Rd. Co.* v. *Archibald, supra,* Mr. Justice White, speaking for the Supreme Court of the United States on this subject, said:    "The elementary rule is that it is the duty of the employer to furnish appliances free from defects discoverable by the exercise of ordinary care, and that the employee has a right to rely upon this duty being performed, and that, whilst in entering the employment he assumes the ordinary risks incident to the business, he does not assume the risk

arising from the neglect of the employer to perform the positive duty owing to the employee with respect to appliances furnished. * * * The employer on the one hand may rely on the fact that his employee assumes the risk usually incident to the employment. The employee on the other has the right to rest on the assumption that appliances furnished are free from defects discoverable by proper inspection, and is not submitted to the danger of using appliances containing such defects because of his knowledge of the general methods adopted by the employer in carrying on his business, or because by ordinary care he might have known of the methods, and inferred therefrom that danger of unsafe appliances might arise. The employee is not compelled to pass judgment on the employer's methods of business or to conclude as to their adequacy. He has a right to assume that the employer will use reasonable care to make the appliances safe and to deal with those furnished relying on this fact, subject of course to the exception which we have already stated by which, where an appliance is furnished an employee in which there exists a defect known to him or plainly observable by him, he cannot recover for an injury caused by such defective appliance if, with the knowledge above stated, he negligently continues to use it."

Mr. Labatt states the rule thus (vol. 2, § 584):

"As regards instrumentalities not belonging to the master, but temporarily placed under his control for the purpose of facilitating the transaction of business in which both he and the owner have a common interest, the only rational and logical doctrine seems to be that a servant, inasmuch as he has nothing to do with the arangement which the master may make with a third party for their mutual convenience, should be entitled to hold the master responsible for the negligent inspection of the thing so transferred, in all cases in which he would have been able to recover if that thing had been owned by, or permanently in the possession of, the master."

Defendant introduced in evidence one of the standard rules of the company to the effect that "trainmen must examine and know for themselves that the * * * appliances which they are to use are in proper condition." The evidence establishes the fact that the rule was always construed to mean that a brake-

man is required to make only such cursory inspection in the course of his regular duties as will discover defects open to ordinary observation, and not to search for hidden defects. Such is the legal construction of a rule of that kind. On this subject Mr. Labatt says (Vol. 1, § 417): "The general effect of express contracts to examine instrumentalities is to narrow the domain of facts within which the servant is entitled to claim the benefit of the principle that he is entitled to rely upon the proper performance of the master's duties. But it seems to be a legitimate inference from the decisions that, in regard to such examination as may be undertaken in compliance with contracts of this description, they do not impose upon him the obligation of using a higher degree of diligence than that which would otherwise have been incumbent upon him. He is required to take notice of apparent defects like those involved in the cases cited in note 5 to this section. But he is not bound to look for concealed defects."

The instruction given by the court was not only in accordance with the law on the subject aside from any particular rule or custom, but it accords with the rule of the company as ordinarily interpreted. *St. Louis, I. M. & S. Ry. Co.* v. *Rogers, supra.*

Appellant's requested instruction, quoted above, which the court refused to give, was erroneous for more than one reason. In the first place it was incorrect in assuming that Bryant (or the junction with the Bauxite & Northern Railroad) was a point where any rule of the company requiring the trainmen to inspect appliances and cars was applicable. In other words, the instruction erroneously assumes that because the junction was not an inspection point the alleged rule requiring trainmen to inspect cars was applicable. This was incorrect because there is evidence showing that for purposes of traffic in transporting ore from the Bauxite reduction plant, the Bauxite & Northern Railroad was treated as a spur, even though it was in fact an independent line. Plaintiff and McDonald, another brakeman, testified that in the shipment of ore from the reduction plant the defendant took out only cars which it furnished for that purpose. The only inference from their testimony is that defendant, in receiving shipments of ore, treated the Bauxite & Northern Railroad merely

as a spur for the purpose of delivering cars to the reduction plant and in getting them back loaded with ore for shipment. Other witnesses in the case speak of the Bauxite & Northern Railroad as a part of the reduction plant. Mr. Murphy, the superintendent of the Arkansas division of the defendant's road, who was introduced as a witness by defendant, testified to that effect. He speaks of the reduction plant as being owned by the Bauxite & Northern Railroad, and stated that that road was engaged in no other business except of handling ore from the reduction plant. Now, if it is true that defendant furnished cars from its own line to be loaded with ore, and only received back the same cars loaded for shipment, the rule of the defendant company requiring trainmen to inspect at noninspection junction points would not apply. The master's duty of inspection applies to cars furnished in that way, for, under those circumstances, the defendant's control over such cars was never relinquished. The fact that the cars were switched over to the reduction plant by an engine of the Bauxite & Northern Railroad, an independent line operated for the benefit of the reduction plant, does not change the rule as to the duty of the defendant, as master, to inspect the cars. The circumstances are substantially the same as where a railroad furnishes cars to any manufacturing plant on a spur, to be hauled to the plant for loading by an engine owned by the plant. Under that state of facts cars remain in control of the railroad company, and fall within the duty of the master to inspect. The testimony is undisputed as to the manner in which the cars were furnished for shipment of ore, and received back on defendant's line—that it received back only the cars which it had furnished. It is contended that the testimony of Mr. Murphy, the defendant's superintendent, is to the contrary, but we do not think so. Murphy was examined only as to the custom, generally, as to getting cars from other lines; he was not questioned with reference to the cars received from the reduction plant at Bauxite, and he made no statements as to them. So it was improper to submit to the jury the question as to the duty of plaintiff to inspect at what is termed "noninspection" points.

Another reason why this instruction was erroneous is that there is no testimony to show that there was a rule of the com-

pany, of which plaintiff was informed, or of which he was bound to take notice, requiring trainmen to inspect at non-inspection points. Plaintiff testified that he had been working for defendant several months, and had not heard of such rule; that he had worked as brakeman and conductor on railroads in other States for about thirteen years, and never heard of any such rule in railroad service. The only other testimony on that subject was that of Mr. Murphy, who stated that during January, 1910, "it is a rule and understood that trainmen will know that a car is safe to handle before they take it at point where inspectors are not maintained." It was not claimed that this was one of the published rules of the company, nor was it stated in testimony how long a time it had been a rule or custom for trainmen to inspect cars at what they called non-inspection points. Plaintiff was not bound by a rule or custom which had not been brought to his attention, and he is not presumed to have notice of a rule not regularly promulgated or of a custom not shown to have prevailed for some considerable length of time. *Little Rock, M. R. & T. Ry. Co.* v. *Leverett,* 48 Ark. 333; *St. Louis, I. M. & S. Ry. Co.* v. *Holmes, supra; St. Louis, I. M. & S. Ry. Co.* v. *Puckett,* 88 Ark. 204.

We conclude, therefore, that the trial court committed no error, either in giving instruction No. 5, or in refusing to give defendant's requested instruction No. 6. We do not find error in any of the rulings of the court in giving instructions or in refusing requests therefor. We think the case was submitted to the jury upon correct instructions, and that the testimony sustains the verdict as to liability of the defendant for plaintiff's injury.

The final contention is that the assessment of damages was excessive. Plaintiff was, at the time he received the injury, 35 years of age, and was and had always been in perfect health and free from any bodily ailments or defects. He had been in railway service as brakeman and conductor about 13 years; had worked for defendant as brakeman several months, and was earning $79 per month. The fall from the train caused a marked lateral curvature of the spine, the whole trunk was bending over toward the left side, and the body was bulging out on the right side, as stated by one of his physicians. It was, at the

time of the trial, impossible for him to stoop or bend down-
wards so as to pick up an object off the floor.   He suffered
great pain all the time, and was unable to perform labor of any
kind.   He suffered pain in the small of the back, and that part
of the body was decidedly swollen.   The injury resulted in the
loss of his sexual power.   Physicians testified that the injury was
permanent, that he had not improved since he received the injury
and would never improve.   They stated that on the contrary·
the indications were that he would grow worse.   One of the
physicians testified that he would not only not be able to perform
manual labor, but that the tendency of the injury would be to
destroy all of the patient's energy and inclination to work.   The
treatment which had been administered, though unavailing, was
necessarily very painful.   While the amount of the verdict seems
to reach the limit, yet we cannot say it is excessive.   The man's
life is permanently wrecked physically and otherwise.   Con-
sidering his loss of earning capacity, and the pain and suffering
he has endured, and will continue to endure as long as life
lasts, together with the other elements which may properly be
considered in estimating the damage, he is entitled to a vastly
larger amount of damages than his widow or next of kin would
be entitled to recover if he had been killed.   The evidence is,
we think, sufficient to sustain the assessment of damages, and
we do not feel justified in disturbing it.   The judgment is
affirmed.

Wood, J., (dissenting).   First. The court should have given
prayer for instruction No. 6 requested by appellant, which
is as follows:  "If the plaintiff knew that Bryant was not a point
at which defendant kept an inspection, and plaintiff, either in
entering or remaining in the service of the defendant, had as-
sumed the duty of inspecting or seeing for himself at such a point
that the grab-irons on cars delivered there to defendant by
another line were safe and failed to do so, but attempted to use
the grab-iron without ascertaining whether it was safe or not,
and fell and was injured, your verdict should be for the de-
fendant."

And the court should have refused instruction No. 5 given
at the request of appellee, which reads:  "The plaintiff is required
to use ordinary care for his own safety, but this does not include

inspection of the cars and appliances for defects; that duty being upon the defendant, and the law permitting the plaintiff to rely upon the defendant for the performance of that duty for his safety. The plaintiff is only required, in the exercise of ordinary care, to take notice of such defects and dangers as are patent to ordinary observation without the inspection which the law requires at the hands of the defendant."

This ruling of the court in refusing prayer No. 6 for appellant and in giving prayer No. 5 for appellee took away from the jury the question as to whether or not it was the duty of appellee in the exercise of ordinary care for his own safety to have inspected the cars at Bryant junction. The court, in other words, told the jury, as matter of law, that it was the duty of appellant to have made the inspection, and that such duty did not devolve upon appellee. Now, Mr. Murphy, superintendent for appellant on the Arkansas Division, testified as follows: "It is a rule and understood that trainmen will know that a car is safe to handle before they take it at points where inspectors are not maintained." "Bryant junction is such a point. The business done there will not warrant keeping an inspector. Some days we may get ten cars, and then we may not get a car for a week. The business done there does not justify it. That is covered by the rules." He further testified that the Bauxite & Northern Railroad was "an entirely independent railroad, and it was operated as such between junctions with the Rock Island and appellant. The car on which Webster was injured was a Rock Island car, that was the system to which it belonged or with which it was affiliated, and the Bauxite & Northern connects with that railroad as well as with the Iron Mountain. The Bauxite & Northern has no cars of its own. It runs from the Iron Mountain and the Rock Island out to the mines for the purpose of getting the ore. All the cars that we handle are cars of our own road or *some other road that goes in there.* We get cars from wherever traffic takes them." Witness McDonald testified that "there is a little independent railroad that juts out there a mile and a half from Bryant, the Bauxite & Northern." He believed that this independent railroad had a connection with the Rock Island. He "knew there was no car inspector maintained at that junction." Witness Farrabee testified: He was conductor on the train from

which Webster fell. "The Bauxite & Northern connects with
the Iron Mountain. They have two miles of track that connects
with our main line, and also with the Rock Island. I was in-
structed that day to pick up those cars. They came from the
mines on the Bauxite & Northern. I can't say whether we de-
livered the car there or whether the Rock Island delivered it. It
belongs to the Rock Island." Appellee himself testified about
the existence of Bauxite and the Bauxite Spur. He admitted
that he knew of the existence of it. He had heard that appellant
had built a spur out in order to get part of the stuff that had been
going to the Rock Island, but knew nothing about who owned
the property. *He knew that there was no inspector at Bryant;
had never seen any there;* had always worked for companies that
had car repairers to receive or reject them; he had been working
on the local through Bauxite Junction *for two months, and knew
that no inspector was maintained.*

Appellee testified, in giving his explanation of the rules of the
company requiring the trainmen to know that all grab irons, etc.,
were safe, that it was their duty to take notice of "all *possible*
defects;" and, proceeding, the following occurred:

"Q. · Mr. Webster, the rule does not say that every engineer
and every fireman and every brakeman is to examine every grab·
hold, does it? A. Yes, sir; all. You shall examine it before
you use it. Q. Do you understand that you are required to
know that all brake wheels, dogs, grab irons, hand holds, steps,
and all other appliances are secure and in safe condition before
using same? That is the question the company asked you and
you stated yes. Is there anything in that question about inspect-
ing? A. You have got to see to know, and you can not know
without inspecting, and therefore it's a case of inspecting when it
comes to the show down."

The court could not withhold instructions appropriate to any
theory of the cause sustained by competent evidence. *Smith* v.
*State,* 50 Ark. 549. "It is error to refuse to give a specific in-
struction clearly applying the law to the facts of the case, even
though the law in a general way is covered by the charge given,
unless it appears that no prejudice has resulted." *Western Coal
& Mining Co.* v. *Moore,* 96 Ark. 206. The court, in refusing
prayer No. 6 for appellant and in giving instruction No. 5

for appellee, absolutely ignored · the above testimony, and treated the Bauxite & Northern as if it belonged to the appellant and was operated solely by appellant. It was a vital issue in the case as to whether the Bauxite & Northern was an independent railroad and operated as such, for, if it was, then it became the duty of appellee to make inspection of the cars for his own safety, and appellant owed him no duty whatever to make inspection for him. Although appellee testified that he did not know of this rule of the company requiring employees to make inspection of the cars for their own safety at junction points with other railroads, yet his own testimony shows that he had been working at Bauxite & Northern junction with appellant for two months. He was a railroad employee of long experience. He knew that no inspector was maintained at Bryant junction. His own testimony shows familiarity with the rules of the company as to the duty of employees to make inspection, and Mr. Murphy testified that it was understood that the employees were to make inspection for themselves at such points. It was, to say the least of it, a question for the jury under the above testimony which we have quoted from the record to say whether or not appellee knew that the Bauxite & Northern was an independent railroad, and whether or not it was the duty of appellee to make inspection of the car on which he was injured for his own safety. Conceding that there was evidence on the part of appellee to warrant the contrary conclusion, still appellant, under the law, certainly had the right to have its theory of the evidence as above set out presented to the jury, and it was impossible for it to have had a fair trial without it. It is palpable error to assume, as an undisputed fact, that appellant handled only the cars that it sent in to the mine. While witnesses say it handled the cars it sent in, none of them say that these were the only cars it handled, and the testimony quoted above tends to show that it might have handled cars that had been delivered to the Bauxite & Northern by the Rock Island. It was a Rock Island car, and appellant handled traffic from wherever it was received. The question was for the jury.

Second. The purported deposition of Dr. C. E. Bentley, and his deposition considered as the deposition of Dr. Barlow, should have been suppressed. The deposition was not written or read in the presence of the witness. It was not signed by

the witness. It was not sealed and mailed or delivered by the officer taking the same. It was not published by the clerk. There is no certificate of the officer showing that it was written in his presence, and no certificate showing that the signature of the witness to the purported deposition was waived. These are positive requirements of the statute that cannot be waived except by written agreement signed by the attorneys representing the respective parties at the taking of the depositions, or by oral agreement about which there is no controversy. And, as to waiver of the signature of the witness, there could be no evidence introduced as to that in the absence of the certificate of the officer before whom the deposition was taken showing that the signature of the witness had been waived.

(1) Where there has been no compliance with the requirements of the statute, and no written waiver thereof, and the attorneys differ upon the question as to whether or not there has been a waiver by oral agreement of such requirement, the trial court cannot determine the controversy by calling the attorneys to testify pro and con concerning it. The reason is obvious. The trial court must not be allowed to inaugurate a swearing match between the reputable attorneys that practice before it in order to settle disputes of this kind. It cannot do so without bringing the administration of justice into contempt. The very decision that it must make between the attorneys, who are officers of the court and who are sworn to uphold the law, brings that law into disrepute. To illustrate by the record here: Frank Pace, attorney for the plaintiff, testified: "The agreement that was entered into with reference to the taking of the depositions was that all objections to the materiality or irrelevancy or competency of the testimony should not be urged before the officer taking the depositions, but might be urged before the court at the time the depositions were to be read, and that all formalities in connection with the taking of the depositions, transmittal of the same, the matter of signing, etc., should be waived by both parties. The agreement was not reduced to writing while I was in the room, and I know nothing of the agreement." And Jeff Davis, also attorney for the plaintiff, testified: "It was stated among all of us that all formalities as to the taking of depositions were waived." On the other hand, Lovick Miles, attorney for the defendant,

testified: "There was not a word said that could be construed into a suggestion as to the waiver of formalities in taking or the formalities in transmission of this deposition or any deposition taken that day. There was not any mention of that subject by any party. There was no reference made to the formalities in the taking or the formalities of transmission of these depositions; witness stating he noticed there was no agreement made, as is usually the case, and made a mental note of the fact; figuring that, in view of the time, it was doubtless the purpose of counsel to bring the depositions in person to the court, and, if they did so and it became necessary, counsel for defendant would raise the question." Now, the court could not believe and accept the testimony of the witnesses for one side without disbelieving and rejecting the testimony of the witness for the other side. There was no middle ground, and no room for mistake, and the witnesses presumably were equally worthy of credit. How could the court settle a controversy of this kind without arbitrarily calling in question the credibility of an attorney or attorneys practicing before it? This subjects the attorney whose word is not received by the court to unnecessary humiliation, and tends also to arouse in him, if he be a man of truth and honor, indignation towards and contempt for the judge who has refused to believe him. "It must be conceded that the standing and reputation of counsel for fairness and honorable conduct and his real or apparent standing with the court has great weight with the jury in determining the importance to be attached to the evidence introduced by such attorney, as well as to his argument in discussing such evidence. If the jury be of the opinion that the counsel is a man who, in the defense of a suit, would resort to questionable and dishonorable methods to gain advantage, they would naturally expect the same conduct in the presentation of the evidence and in the argument of the same." *Tuttle* v. *State*, 83 Ark. 379. This practice tends to destroy that mutual respect and confidence that the court and members of the bar must have towards each other, and which is essential in the orderly administration of justice. The court by its decision virtually brands the attorney against whom he decides as a perjurer, while the attorneys in whose favor he decides are thereby pronounced men of honor and truth. The due administration of justice forbids

that the trial court should make such invidious distinction between the attorneys who must practice before it. Such rulings must inevitably create a prejudice in the minds of the jurors who may be impaneled to try the cause. For the regular panel is usually present when such controversies are settled, and there is nothing to show that it was absent when the ruling herein complained of was made. The requirements of the statute in the matter of taking depositions are plain. The court must see that these are duly observed or else waived by acts of the parties or their attorneys about which there is no dispute. The law does not contemplate that the court shall array attorneys against each other in a swearing contest to settle a controversy between them as to whether or not there was a waiver by oral agreement of the statutory requirements. This, it seems, the court did in the present case. For the record recites: "Thereupon the depositions of C. E. Bentley and Mr. J. Barlow having been filed in open court by the Hon. Jeff Davis, of counsel for plaintiff, defendant filed its motion to suppress, said motion being in the following words and figures (here follows the motion setting up the statutory requirements and alleging they had not been complied with). Then the record recites: "The court thereupon had counsel, Jeff Davis and Frank Pace, for plaintiff, and Lovick P. Miles, for defendant, sworn, and upon said motion the following testimony was heard." Then follows the testimony. In passing upon the motion to suppress, when the court ascertained that the depositions had not been taken and transmitted as the statute requires and that the attorneys differed as to whether or not there had been a waiver of the requirements of the statute, and that there was no written waiver signed by attorneys for both sides, then the court should have suppressed the depositions and allowed the plaintiff to retake same. There was no other course for the court to pursue. This could not have prejudiced the rights of either, but would have preserved the rights of both. Instead of doing this, the court, without any request therefor from either side, put the attorneys on the witness stand, and arbitrarily accepted the testimony of the attorneys on the one side, and arbitrarily rejected the testimony of the attorney on the other side. In my opinion a waiver cannot be established in this manner. To constitute a waiver, there must be no doubt about the existence of the fact

upon which the waiver is predicated. But where credible witnesses on the one side swear that there was an oral agreement to waive formalities and a witness equally credible on the other side swears that there was no such oral agreement, it is impossible for the court to determine that the waiver was proved beyond doubt, and it should, in such cases, leave the attorneys where it finds them by suppressing the purported deposition for noncompliance with the statute, and, as I have stated, give leave to retake.

(2) The court should not have called for and permitted oral testimony for the further reason that such testimony enlarged and changed the effect of the written agreement concerning the deposition of Dr. C. E. Bentley. The stipulation was as follows: "The foregoing deposition of Dr. C. E. Bentley was taken and notation of objections and exceptions by plaintiff and defendant, before the notary, not made, it being understood and agreed that all objections and exceptions to any part of direct or cross examination may be made and submitted to the court when the deposition is offered. "It is further agreed that, in the event Dr. M. J. Barlow is not present at the trial of this case, that his testimony, if present, would be substantially the same as that of Dr. Bentley." This stipulation contains no waiver of the statutory requirements as to transmission, signing, etc. The court permitted such waiver to be proved by parol. "Parol evidence is not admissible to vary the terms of a valid written stipulation." 36 Cyc. 1298, note. The evidence does not warrant the conclusion that there were two separate stipulations concerning the deposition of Dr. C. E. Bentley, one oral and the other written. Frank Pace testified as follows: "Q. At what particular time of the examination of Dr. Bentley did the agreement take place? A. Soon after he began to testify. Q. You told the court there was an agreement to waive all formalities as to the taking of the depositions? A. There was; all formalities as to the matter of taking and signing, etc. Q. How many agreements did we make during the taking of the depositions? A. Only two that I know of. Q. Did we make two separate agreements? A. Yes, sir; the agreement with reference to Doctor Barlow's and the other one that was made before the taking of the deposition. Q. Now, as to the agreement as to Dr. Barlow's being

substantially the same? A. It didn't come up until after Dr. Bentley's had been given. It was at a different time. Q. Now, there was one other agreement made? A. Yes, sir. Q. Do you recall what preceded the agreement as to not making objections in the presence of the notary as to the competency and relevancy of the testimony? A. I think that soon after we began to take depositions you asked would it be necessary to object formally before the notary to any testimony that you thought was irrelevant or incompetent, and we told you that we would agree with you that that was not necessary. It was there in connection with that agreement that we entered into to waive all formalities in connection with the taking of the depositions, certifying of the same and the transmission of the same." Jeff Davis testified: "Mr. Pace began the examination of Dr. Bentley. They had gone some little distance in taking the deposition when I began to ask some questions, and then it was that Mr. Miles asked what is your rule here about objections? Do you object before the notary and have the objections noted, or can we do that before the court? I stated that is all right, and Mr. Miles then stated well, we can have a little agreement to that effect as to the objections to the competency of the testimony. * * * I suggesed to Mr. Miles that he agree that the testimony of Dr. Barlow would be substantially the same as that of Dr. Bentley, and after some little time he agreed to that. I started to dictate that agreement as to Dr. Barlow's testimony, and my recollection is that Mr. Miles took the matter away from me and dictated the agreement that you see." The above testimony shows clearly that there was only one agreement between the attorneys for appellant and appellee concerning the purported deposition of Dr. Bentley. Whatever the oral agreement between them may have been, when they afterwards reduced the agreement to writing, oral evidence of what occurred at or before the time was inadmissible to contradict, vary, or enlarge it. In other words, the same rule applies to stipulations of this kind as governs written contracts. *Fields* v. *Watkins,* 5 Ark. 672; *Quertermous* v. *Kennedy,* 29 Ark. 544; *Turner* v. *Baker,* 30 Ark. 186; *Haney* v. *Caldwell,* 35 Ark. 156; *Richardson* v. *Comstock,* 21 Ark. 69; *Anderson* v. *Wainwright,* 67 Ark. 62; *Colonial & U. S. Mortgage Co.* v. *Jeter,* 71 Ark. 185.

(3)   The court by permitting oral testimony to prove that the parties had waived the signature of the witness to the deposition nullified the statute.   Section 4 of the act of May 11, 1905, is as follows:   "That if the deposition is written by a stenographer, the witness may appear before the officer taking the same after the deposition has been transcribed and sign the same.   Provided, the parties to the suit may at the time of taking waive the witness' signature.   Provided, further, that if the signature is waived by the parties, the officer before whom the same is taken must so certify."   The purported deposition of Dr. Bentley was written by a stenographer, but he did not sign the same, and the officer before whom it was taken does not certify that the signature was waived by the parties.   But the lower court held, and this court now holds, that the certificate of the officer was not necessary.   This holding, it seems to me, ignores the positive mandate of the law.   For the act says if the signature is waived, the officer *"must so certify."*   The language is mandatory, and intended to be so by the law-making power.   The Legislature, having under consideration the subject of the waiver of the signature of the witness, enacts that it can be done, and provides the only way that it can be established when it is done is by the certificate of the officer before whom the deposition was taken. Where the fact of waiver is controverted, as it is here, then the only way by which it can be proved under the above statute is by the certificate of the officer.   We cannot substitute another mode instead of that provided by the Legislature without assuming legislative prerogatives and violating one of the plainest of all the rules for the construction of statutes and governing the conduct of courts towards the coordinate, legislative department. "Where that which is directed to be done is within the sphere of legislation, and the terms used clearly express the intent, all reasoning derived from the supposed inconvenience, or even absurdity, of the result is out of place.   It is not the province of the courts to supervise legislation, and keep it within the bounds of propriety and common sense."   ."The exercise of the power of the Legislature cannot be restrained or varied by the courts to subserve convenience, to relieve from hardships or from requirements that seem unreasonable or even absurd, where the language is plain and unambiguous."   *Little Rock* v. *North Little Rock,*

72 Ark. 195; *Woodson* v. *State,* 69 Ark. 521; *Conrad* v. *State,*
65 Ark. 559; *Railway Co.* v. *B'Shears,* 59 Ark. 237; *Sims* v.
*Cumby,* 53 Ark. 421; *Springfield, etc., Ry. Co.* v. *Lambert,* 42
Ark. 121; *Bennett* v. *Worthington,* 24 Ark. 487. Courts can not
legislate even to set aside unreasonable and absurd statutes in
order to subserve the principles of justice and humanity. *Sims* v.
*Cumby, supra.* But the statute under consideration was passed
to secure the accuracy and preserve the integrity of testimony
taken by deposition, and thereby to protect parties litigant, their
attorneys and the court, from any possible imposition or fraud.
It therefore serves a most wise and useful purpose. If the re-
quirements of the statute are observed, it would be impossible
for any fraud to be perpetrated by the changing of testimony
after it was taken or by manufacturing evidence. For a fraud
of that kind under the requirements of the statute could not
escape detection. But, under the rule established by the lower
court and sanctioned by this court, testimony wholly simulated
could be produced on the day of the trial under the guise of a
deposition taken by alleged agreement whereby all formalities
and statutory requirements for taking, signing, transmitting, etc.,
were alleged to have been waived; and, if the waiver were denied,
it would be possible for oral testimony, equally false and simu-
lated, to be brought forward to prove it. Thus parties and their
attorneys who were honest and truthful would be entirely at the
mercy of a designing and unscrupulous adversary. Hence, the
policy of the law as expressed in the statute under consideration
positively requires the waiver, if made, to be proved by the high-
est character of written evidence, towit: the certificate of the
officer. By requiring that the proof *must be* made in this way,
the Legislature, of course, forbade that it could be done in any
other. The Legislature for the first time was creating the right
to take the depositions in short-hand and regulating that right.
Sections 3 and 4, act of May 11, 1905. "Since the statute
creates and regulates, there is no ground for claiming or pro-
ceeding except according to it." "Where authority is given to
do a particular thing, and the mode of doing it is prescribed, it is
limited to be done in that mode; all other modes are excluded."
The doctrine of *expressio unius est exclusio alterius* applies with
full force. Lewis' Sutherland, Stat. Con. § § 491, 92 and cases

cited in note. Where a statute or rule of court requires that stipulations between parties or their attorneys shall be in writing, the authorities are unanimous that no oral stipulation made out of court will be regarded, except in so far as it is not controverted. 4 Wigmore on Evidence, § 2594; *Shippen* v. *Bresh,* 1 Dall. (Pa.) 251; *Hess* v. *La Junta, etc., Co.,* 25 Col. 515, 55 Pac. 728; *Broom* v. *Wellington,* 1 Sandf. N. Y. 665; *Beem* v. *Greene,* 2 Caine 94; *Clark* v. *Dekker,* 43 Kans. 692; *Evans* v. *State Nat. Bank,* 19 Fed. 676; *Parker* v. *Root,* 7 Johns. 320; *Dubois* v. *Roosa,* 3 Johns. 145; *Huff* v. *State,* 29 Ga. 424; *Reece* v. *Mahoney,* 21 Cal. 305; *Patterson* v. *Ely,* 19 Cal. 29; *Texas & P. Ry. Co.* v. *Boggs,* 30 S. W. 1089; *Kent* v. *Green,* 62 N. W. (Neb.) 71; *American Saddle Co.* v. *Hoff* (U. S. Cir. Court, Mass.), Federal Cas. No. 360; *Woodruff* v. *Fellows,* 35 Conn. 105; *Fernald* v. *Ladd,* 4 N. H. 371; *Dunkling* v. *Whitlaw,* 1 McCord (S. C.), 492; *Roberts* v. *Partridge,* 118 N. C. 355; *Taylor* v. *Chicago, M. & S. P. Ry. Co.,* 80 Ia. 431, 46 N. W. 64; *Hardin* v. *Iowa Ry. & Const. Co.,* 78 Ia. 726, 43 N. W. 543; *Louisville, N. A. & C. Ry. Co.* v. *Boland,* 70 Ind. 595; *Morse* v. *Budlong,* 38 Pac. (Col.) 59; *Ransom* v. *Peters,* 2 Ala. 647; *Kent* v. *Green,* 43 Neb. 673; *Bradford* v. *Downs,* 49 N. Y. Suppl. 521; *Birdwell* v. *Cox,* 18 Tex. 535; *Palatka & I. R. Rd. Co.* v. *State,* 11 Am. State Rep. (Fla.) 395; *Gulf, C. & S. F. Ry. Co.* v. *King,* 80 Tex. 681.

The above cases, cited in the brief of counsel for appellant, are conclusive of the question under consideration. If there was a waiver of the signature of the witness (Dr. Bentley) as alleged, it was but a stipulation of counsel to that effect out of court, and such a waiver, the statute says, must be proved by the certificate of the officer before whom the deposition is taken. The statute being for the benefit of the parties, they may waive it. But where the question is whether they have waived it—the one asserting and the other denying—then the only way to prove it is the way prescribed by the statute.

For the errors indicated the judgment should be reversed and a new trial granted. Having reached this conclusion, we need not discuss the question of the excessiveness of the verdict.

Hart, J., concurs in this opinion.