ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY
*v.* BROWN.

Opinion delivered May 15, 1911.

1. MASTER AND SERVANT—NEGLIGENCE—EVIDENCE.—Where a brakeman was suing for personal injuries caused by the negligence of a fellow servant in starting an engine forward before the signal to do so was given by the plaintiff, thereby throwing plaintiff forward and injuring him, it was error to permit plaintiff to prove that he was neglected at the railroad hospital, and suffered for lack of proper treatment. (Page 114.)

2. APPEAL AND ERROR—INCOMPETENT EVIDENCE—EFFECT.—In an action by an employee to recover for personal injuries where the issue was merely as to whether plaintiff's injuries were due to defendant's negligence, the introduction of incompetent evidence tending to prove that plaintiff was neglected at the railway hospital after he received his injuries, and that he suffered for lack of proper treatment, even if the error was not cured by its subsequent withdrawal, could not have caused the jury to find against the defendant upon the question at issue, as its only effect was to arouse sympathy or excite prejudice. (Page 117.)

3. INSTRUCTIONS—CONSTRUCTION AS A WHOLE.—If the various instructions separately present every phase of the case as a harmonious whole, there is no error in certain instructions failing to carry qualifications which are contained in others. (Page 119.)

4. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—INSTRUCTION.—It was not prejudicial error to instruct the jury, in a personal injury suit, that "the burden of proof is on plaintiff to establish his case by a preponderance of evidence to entitle him to recover, and the burden is on defendant to establish contributory negligence on the part of plaintiff by the preponderance of the evidence in the whole case, in in order to prevent a recovery for that reason." (Page 119.)

5. INSTRUCTION—OBJECTION—EXCEPTION.—Error of the trial court in modifying an instruction which should have been given without modification cannot be insisted upon if no objection was made to giving it as modified, and no exception saved thereto. (Page 120.)

6. TRIAL—MISCONDUCT OF COUNSEL.—A statement of plaintiff's counsel, in explanation of plaintiff's injuries, that plaintiff's fellow servants were worked overtime, not being based on testimony, was improper, but was not prejudicial where it was withdrawn when objected to (Page 121.)

7. APPEAL—NECESSITY OF OBJECTION.—Statements of counsel in argument which were not objected to in the trial court cannot be complained of on appeal. (Page 122.)

8. DAMAGES—WHEN EXCESSIVE.—Where the evidence tended to prove that plaintiff's injuries were fatal, that he was paralyzed and rendered incapable of doing any work, that his probable earnings for the rest of his life, added to the medical expenses incurred by him, amounted to $18,000, a verdict for $50,000 is clearly excessive. (Page 122.)

9. APPEAL—REMITTITUR OF EXCESSIVE DAMAGES.—In fixing the amount that a plaintiff will be permitted to recover, where a verdict is excessive, the court will not be careful to see that it shall be sufficient to compensate for the injury sustained, but rather that the amount required to be remitted shall be large enough to strip the verdict of any prejudicial elements, giving the defendant the benefit of reasonable probabilities in respect to the amount of recovery, and reduce the judgment to an amount clearly regarded as not excessive. (Page 123.

Appeal from Hot Spring Circuit Court; *W. H. Evans,* Judge; affirmed on remittitur.

### STATEMENT BY THE COURT.

This suit was brought by appellee for personal injuries alleged to have been caused by the negligence of the railway company. He was a brakeman, 22 years of age, in the service of the railway company, and injured while making a flying switch at Ozark. It was his duty to uncouple the car which the engine was pulling coupled to the pilot or cow catcher, and ride it down and couple it to the train while the engine went on down another track. In doing this, he stood on the pilot or cow catcher holding to the rod which crosses the front of the pilot. He waited until the engineer on his signal "gave him the slack" and then pulled the pin. The pin is pulled by means of a lever attached to one end of the car—a large rod running across the end of it, turned downward at the end, making a handle, and to this rod is attached a chain fastened to the pin, and by lifting the handle of the lever upward the pin is drawn and the uncoupling made. The pin sometimes catches, and is hard to pull, and several efforts are required to get it. The signals are given by the use of a lantern by the brakeman, one for the slack that the pin may be loosened and more easily lifted, and the other, after it has been pulled, that the engineer may increase the speed of the engine.

On the night of the injury Brown gave the engineer the signal for slack, which was obeyed, and the engine checked, and he attempted to pull the pin by using the lever, and the first time failed to get it.   On the second effort he succeeded, and stated that the engineer, without any signal from him to proceed, suddenly shot the engine forward from under him, throwing him on his face on the track in front of the car. The car passed over him, some portion of it striking him and fracturing the spine or breaking his back.

The engineer testified that the flying switch was made in the usual manner, that he gave Brown the slack upon his signal, and did not start the engine forward nor increase its speed thereafter until Brown gave him the signal to proceed; that he then increased the speed of the engine, as was usual and customary, to about 10 miles an hour, which was necessary to outrun the car and get on a different track, that it might pass.

There was testimony tending to show that, in making the flying switch, the brakeman could stand upon the corner of the car, or the pilot of the engine as Brown did in this instance, upon the place provided there for riding, and that the advantage of this over the other place was that he could give the signals directly to the engineer.

The other place was upon the corner of the car to be uncoupled, with a foot in the stirrup and a handhold of the ladder, the lever being operated with the foot and the pin raised by it.   The advantage of this position left the brakeman on the car which he had to ride after the uncoupling was made, and prevented the necessity of getting off the engine and on to the moving car, and also, in case of accident or falling, left him outside the rails from under the cars, the disadvantage being that he must give the signals to the fireman to be communicated to the engineer.

It was shown that both places for riding were used by brakemen in the making of such switches, some preferring one and some the other, and the engineer thought that the place on the foot board of the engine was the better, since it permitted the brakeman to signal directly to the engineer who controlled the movement of the train.

No one saw Brown when he fell or was thrown from the

engine and injured. The brakeman who was throwing the switch later saw him between the rails, and thought he was cut all to pieces, and could not go to him, but notified those on the engine who went immediately.

Parker, the engineer, said: "I just grabbed my torch and jumped out and went up there. The first thing I asked him was 'how it happened.' He told me his foot slipped. I do not know whether Sullivan heard it or not. After he came up, I do not think we asked him how it occurred."

Sullivan, the fireman testified that Brown said "he didn't know how it happened. He made this statement at the time I went back and found him lying on the track. I didn't ask him; the engineer asked him. The engineer asked him how it happened. I heard him say he didn't know how it happened. He was suffering. He asked me to pinch his leg and see if it was there. He thought his legs were off. He told us to go away. We asked him about it, and he didn't know how it happened. He could not raise up and talk. He was lying then with his head lying on the rail."

He was immediately taken to the depot on a stretcher, and a doctor procured as quickly as possible to attend him. He was brought to the hospital at Little Rock, and it was discovered that his back was broken or the vertebra slipped and pressing on the spinal cord, which caused paralysis of the body below the point of the injury. "So far as motion and sensation are concerned, the lower part of his body is dead. He has no more control of it than if it were not his,"—as stated by one of the physicians. He was in the hospital about forty days, an operation was performed, a drainage tube being inserted in his back, and, while he was there, great bed sores developed on his hips and knees and parts of his body upon which he was compelled to lie most, which finally became so bad, after his removal to his father's home, that the bones were exposed, the doctors saying that the joint oil ran out of his knees, and they thought at the time that his legs would slough off at the knees. He had no control of his bowels and urinary organs, which at times discharged almost constantly, rendering him most offensive and loathsome, was suffering great pain, and it required some one constantly to attend him and took two people always to dress his sores and wounds, the physician and one other,

and sometimes three. He was kept constantly under the influence of an opiate to quiet him, and his body above the injury was normal, so far as it could be, and still be connected with that paralyzed and dead below. His mind continued unclouded and active, and was so at the time of the trial. The doctors who testified said that the injury was necessarily fatal, but that, having lived as long as he did after it, he might live anywhere from one to seven years.

There was testimony tending to show that he had expended $400 or was liable for that amount for the attendance of physicians, and about the same amount for medicines, bandages, absorbent cotton, etc.

Some evidence was attempted to be introduced tending to show negligence of the attendants at the hospital in treatment of him, resulting in producing the sores, but this evidence was afterwards withdrawn. The remarks of counsel in the closing argument were also objected to and modified to some extent but not withdrawn.

The court instructed the jury, giving certain instructions over appellant's objections and refusing to give several for it which will be noticed in the opinion, along with other testimony regarded necessary to be stated. The jury returned a verdict for $50,000 damages, and from the judgment thereon this appeal comes.

*W. E. Hemingway, E. B. Kinsworthy, W. V. Tompkins, Bridges, Wooldridge & Gantt* and *James H. Stevenson,* for appellant.

1. It was error to permit A. H. Brown, the father of plaintiff, to testify that plaintiff was not properly cared for and treated at the hospital of defendant, at Little Rock. The circumstances under which the testimony came before the jury, its prejudicial character, the obvious determination of plaintiff's counsel to impress on the minds of the jury that defendant's hospital attendants neglected him, and the tardiness of the court in suppressing said attempts, separate this from the ordinary case where testimony is offered and withdrawn or excluded by direction of the court. The prejudicial effect of this testimony was not removed by the court's order withdrawing it from the jury's consideration, as is evi-

denced by the verdict. Elliott on Appellate Procedure, §§ 700, 702; 60 Ark. 76, 88; 180 U. S. 552; 100 Ill. App. 382; 110 *Id.* 23, 26; 131 *Id.* 105; 83 Miss, 519; 35 So. 873; 65 Ark. 119; 61 Ark. 137; 131 N. C. 199; 42 S. E. 584; 139 Ill. App. 412.

2. The first instruction given at plaintiff's request is erroneous in that it ignores the issue as to whether, under the evidence, the plaintiff was negligent in taking his station on the pilot instead of upon the car. It is not contended that, as a matter of law, it was negligence for the plaintiff to choose the more dangerous place in which to ride, but that it was a question for the jury to determine whether or not, under all the circumstances, it constituted an act of negligence for him to stand on the pilot, instead of getting upon the car, from which latter place, the evidence shows, he could have done his work in safety. 90 Ark. 543; 1 White on Personal Injuries, § 400; 5 Thompson on Negligence, § 5614; *Id.* § § 5590, 5591, 5685; 86 Ark. 65; 223 Pa. St. 482; 72 Atl. 811; 16 Am. & Eng. Ann. Cases, 27; 175 Mass. 466; 56 N. E. 710; 106 Ia. 253; 76 N. W. 670; 57 Kan. 719; 48 Pac. 12; 99 Pac. 224; 144 Fed. 668; 234 Ill. 272; 44 Col. 236; 99 Pac. 63; 118 S. W. 1113; 121 La. 543; 46 So. 621; 95 Pac. 193; 150 N. C. 400; 64 S. E. 194.

An instruction which assumes to enumerate all the elements of liability and all defenses, but which, while directing a verdict if the enumerated issues are found for the plaintiff, omits a defense upon which there is evidence, is erroneous, regardless of its context. 93 Ark. 573; 30 Ark. 362, 376; 51 Ark. 88; 25 Ark. 490; 2 How. 486, 496; 24 Ala. 651, 652; 4 S. W. 300; 38 N. W. 213, 222; 52 Mo. 35, 38; 85 Mo. 96; 91 Am. Dec. 309; 2 Thompson on Trials, § 2328; 1 Brickwood's Sackett on Instructions, § 173; 1 Blashfield, Instructions to Juries, § 104.

3. The seventh instruction is erroneous. While it is true that contributory negligence as a defense must be proved by the party pleading it, yet this rule is subject to the qualification that this burden attaches only in the event that such contributory negligence is not shown by plaintiff's own evidence. 72 Ark. 573, 579.

4. The court erred in refusing to give the tenth instruction requested by appellant, and in modifying it and giving it as modified. 71 Ark. 501.

5. The cause should be reversed for improper argument of plaintiff's counsel, who, speaking with reference to the alleged negligence of the engineer, charged defendant with working its train crews all day and all night. There was no evidence to support the statement. It was improper, and the subsequent withdrawal of same did not cure the error. 65 Ark. 619, 626, 628.

5. The verdict is excessive, and clearly appears to have been rendered under the influence of passion and prejudice. 65 Ark. 619; 89 Ark. 522, 541; 11 Bush 495, 509, 513, 514, 516; 34 Col. 99; 81 Pac. 763; 55 Ill. 492; 8 Am. Rep. 661; 7 Kan. 380, 382.

*Jeff Davis* and *Frank Pace*, for appellee.

1. There was no error in connection with the admission of the testimony of A. H. Brown. Such part of it as was incompetent was withdrawn by the court from the jury's consideration, to the satisfaction of the attorney for appellant who tried the case. There was no objection to the manner in which the court withdrew the evidence, no request for further instruction or admonition to the jury. Elliott on Appellate Procedure, § § 700, 701, 702; 121 Ind, 267; 89 Ark. 401; 66 Ark. 16; 60 Ark. 48; 77 Ark. 64; 56 Ark. 603; 43 Ark. 99; 75 Ark. 347.

2. Appellant's objection to the first instruction given is without merit. The question of contributory negligence was for the jury to determine from the evidence and the circumstances, and not a question of law for the court; and in determining that question the position plaintiff assumed on the pilot was a mere circumstance for the jury to consider with other facts in evidence. 82 Ark. 18; 87 Ark. 453; 97 Ark. 553; 128 Fed. 529; 159 Fed. 680. See also 88 Ark. 524; 86 Ark. 104; 77 Ark. 485; 69 Ark. 558; 67 Ark. 531; 75 Ark. 325.

3. There is no error in the second instruction given at appellee's request.

4. The object of the seventh instruction was to show upon whom the burden of proof rested on the various issues of the case. There can be no ambiguity in the words "to prevent a recovery for that reason." The context clearly shows

that they refer to contributory negligence on the part of the plaintiff. 67 Ark. 539. Moreover, appellant will not be permitted to urge an objection here that was not raised in the lower court. 65 Ark. 371.

5. The tenth instruction requested by appellant was erroneous as asked, and the court properly modified it before giving it. There was no objection to the instruction as modified. Appellant cannot object here for the first time.

6. There was nothing prejudicial in the argument of counsel. 91 Ark. 579; 23 Ark. 32; 34 Ark. 649, 658; 20 Ark. 619; 74 Ark. 259; 71 Ark. 406.

7. The verdict, in the light of the plaintiff's injuries, his condition resulting therefrom, his prolonged suffering and agony of body and mind, is not excessive.

Kirby, J., (after stating the facts). It is contended first that the court erred in permitting A. H. Brown, father of the plaintiff, to testify that plaintiff was not properly cared for and treated at the railway hospital. This witness stated that, after his son, Claude, was brought to St. Vincent's Infirmary at Little Rock, he and another son stayed with him all the time, and continued:

Q. "How did they treat him down there at that hospital?"

A. "How did they treat him? I didn't think they were treating him right. I took him to my little cabin because, if I thought they were, I would not have taken him to my little cabin at Russellville."

Counsel objected to the question and answer, and it was withdrawn.

The court was then asked by appellant to exclude it from the consideration of the jury, which it did, by saying: "The question and answer will not be considered, as it is withdrawn."

Q. "What was the cause of his pain and suffering down there at the hospital?"

A. "Well, I taken for granted first what the Sisters told me. Caused a great deal ———"

Q. "Not what the Sisters told you, from what you can say on your own knowledge?

A. "I saw he was not taken care of."

Counsel for defendant: "I object to that."

The court did not rule upon the objection, and the question was repeated as follows:

Q. " What was his condition; tell the jury the condition of the boy, what condition they allowed him to get in there at the hospital, and what was the result and effect of that condition?"

A. "Well, he laid there on one side for 24 or 30 and even 35 hours—a day and two nights. That is only what he told me—that he had laid there."

Counsel for defendant interposed: "I object to that because ———"

Before the objection was finished, this question followed: "Tell him what you said?"

A. "I saw him a laying there ———"

Counsel for defendant: "We want to object to that. What does your honor rule on it?"

The court: "He can answer that."

Q. "Tell his condition during the time he was at the infirmary, and at the time you removed him?"

A. "I would go there in the morning and stay with him that day, and they would let him lay there until the next evening without ever being dressed—24 hours—and he seemed to be in a great deal of pain and misery, with pains shooting down into his hips and thighs."

After other questions and answers and objections, the court said:

"I have been thinking that since that question arose, it would be proper to show what pain and suffering there was from the injury, but there is no allegation that he suffered pain by reason of being neglected. I am inclined to think that that would be improper. The court will hold that the plaintiff can show pain and suffering as a direct result of the injury, but, as there is no allegation in the complaint of any neglect by the employees which had him in charge, it will be improper to show any pain and suffering caused by neglect, if any."

By the counsel for defendant:

"What is the ruling of your honor with reference to the testimony?"

The Court: "I thought that was withdrawn as to——except as to the last one. That was my understanding.

Counsel for defendant:

"Since your Honor last ruled, there have been several questions asked."

By the Court:

"This witness can testify as to what he saw and what he knows as to the condition of plaintiff, and as to the amount of the pain and suffering endured by him, without giving the cause of it as stated."

Counsel then asked the court to exclude from the consideration of the jury all the testimony of this witness relating to the condition of the plaintiff, or his pain and suffering arising from any treatment he may have received after being carried to the hospital.

By the Court: "That will be granted. Gentlemen, you will not consider any question or any evidence of this witness relating to any lack of proper treatment while he was in the hospital at Little Rock."

The testimony tended to show neglect of the appellee at appellant's hospital by its attendants and employees, was not competent, and should not have been introduced, but some of it was withdrawn, and the court finally directed the jury not to consider any of it.

"The general rule asserted by many courts is that an error in suffering incompetent evidence to go to the jury over objection may be cured by effective withdrawal of the incompetent evidence. The rule is one, as it seems to us, to be applied with scrupulous care. The rule, as it is sometimes applied, works injustice. The mere withdrawal of evidence does not always efface or remove the effect it has produced. The impression produced by evidence once heard is not easily eradicated. The removal of an impression from the minds of men is not very unlike the removal of writing from paper or parchment; despite earnest efforts to remove it, traces are likely to remain. Whether withdrawal of incompetent evidence does or does not cure the error must depend in a great measure upon the character and influence of the evidence. There may be cases where the character of the evidence is such that a mere withdrawal, without specific instructions or

directions, is sufficient to heal the error; but in many cases the withdrawal should be accompanied by clear and explicit instructions to disregard the evidence entirely and absolutely." Elliott on Appellate Procedure, § 700.

To this rule however there are exceptions, as stated by the same author: "If the case is one in which it clearly appears that an instruction did not remove the effect of powerful evidence, the case must, we believe, be regarded as an exception to the general rule." Section 702. This last is quoted with approval in *Rogers* v. *State,* 60 Ark. 76.

Since the negligence complained of in this case was that of appellant in starting its engine forward before the signal to do so was given by appellee, thereby throwing him from the engine and causing the injury, this testimony was not prejudicial, and could not have caused the jury to find against appellant on the question at issue, even if it be considered that its withdrawal and direction by the court to disregard and not consider it did not cure the error, as it usually does. It will be considered however under the question of excessiveness of the verdict, since at most it could have had no injurious effect as against appellant, but to arouse sympathy or excite the prejudice of the jury against it in its award of damages.

It is contended next that error was committed in the giving of appellee's instruction No. 1, which reads: "If the plaintiff was in the performance of his duty in the employ of the defendant riding on one of its engines, engaged in making a flying switch and using due care for his own safety, and had not assumed the risk, and was injured by want of ordinary care of the engineer of the defendant in charge of said engine, as set forth in the complaint, thereby throwing plaintiff from engine and injuring him, the defendant would be liable. It is for the jury to say from the evidence whether the plaintiff was in the line of his duty in the employ of the defendant when he was riding on the engine at the time of injury; and also it is for you to say from the evidence whether plaintiff was exercising due care for his own safety, or had assumed the risk; also whether defendant through its engineer failed to exercise ordinary care in the movements of the engine, as charged in the complaint, and as to whether such want of

ordinary care on the part of the engineer, if so shown, was the proximate cause of the injury."

It is insisted that this instruction attempts to tell the jury all the elements and issues upon which they must pass before they can find for the plaintiff, and that it is erroneous because it ignored the defense in the case of contributory negligence, in effect directing the jury that they might find a verdict without regard to the contention of defendant that plaintiff was guilty of contributory negligence in riding on the footboard of the pilot, instead of upon the corner of the car.

The question whether Brown was guilty of contributory negligence in riding upon the engine instead of the corner of the car, which some witnesses testified was the safer place for that purpose, was one to be determined by the jury under proper instructions from the court, and this instruction told them that he could not recover, even if the defendant was negligent, as charged, unless he was in the performance of his duty in the defendant's employ, riding upon one of its engines, engaged in making a flying switch and using due care for his own safety, and he could not have been guilty of contributory negligence if he was in the exercise of due care while engaged in making the flying switch. He was as much engaged in making the flying switch in boarding the pilot of the engine and standing there for that purpose or in clinging to the corner of the car, if he had done so, as while he was attempting to make the uncoupling, for it was necessary to ride at one or the other of these places in order to make it; and, since the instruction required him to be in the exercise of due care while making it, it is not open to the objection; and, besides, a specific instruction was given for the defendant, submitting this point to the jury, which in no way conflicted with said instruction.

Under its instruction No. 5, given, the jury were told that if he was a brakeman, "and while engaged in making a running switch was riding upon the pilot of the engine, and undertook to uncouple from the engine a car which was being switched, and that a person of ordinarily reasonable prudence and caution similarly engaged would not have ridden on the pilot of the engine and in the position which plaintiff had assumed, then you are instructed the railway company

is not liable for his injury," and the jury were directed to find for the defendant, even though they might find the engineer operating the engine was negligent in starting it forward or increasing the speed before he received a signal to do so.

"It is generally impossible to state all the law in the case in one instruction; and if the various instructions separately present every phase of it as a harmonious whole, there is no error in each instruction failing to carry qualifications which are explained in others." *St. Louis S. W. Ry. Co.* v. *Graham,* 83 Ark. 61; *Louisiana & A. Ry. Co.* v. *Ratcliffe,* 88 Ark. 524; *St. Louis, I. M. & S. Ry. Co.* v. *Day,* 86 Ark. 104.

"An instruction is not objectionable as ignoring proof tending to establish defendant's theory of the case, if that theory is sufficiently presented in another instruction." *St. Louis, I. M. & S. Ry. Co.* v. *Baker,* 67 Ark. 531; *Louisiana & A. Ry. Co.* v. *Ratcliffe, supra; Southern Cotton Oil Co.* v. *Spotts,* 77 Ark. 462.

The second instruction given for plaintiff was objected to for the same cause, it being claimed that the contributory negligence of the defendant was limited by its terms—"if the plaintiff at the time was in the performance of his duty, and exercising ordinary care for his own safety,"—to the action of plaintiff after he assumed his position on the pilot of the engine, and excluded the idea from the jury that he might have been guilty of such negligence in taking his place there, instead of upon the corner of the car. This contention is without merit, however, and has already been answered in answering the objection to instruction No. 1. Neither do we regard its objection that instruction No. 4 given for the plaintiff assumes that the defendant was negligent or permits the jury to take that fact for granted.

In instruction No. 5, objected to, the expression "while engaged in making a flying switch" was used, and it is insisted, as in objection to instruction No. 1, that such expression limits the jury to the conduct of plaintiff after he boarded the pilot of the engine. We do not agree with this contention for the reasons already given in answer thereto.

In instruction No. 7, relative to burden of proof, the court told the jury: "The burden of proof is on plaintiff to establish his case by a preponderance of evidence to entitle him to re-

cover, and the burden is on defendant to establish contributory negligence on the part of plaintiff by the preponderance of the evidence in the whole case, in order to prevent a recovery for that reason, etc."

The meaning of this instruction is not as clear as it could have been made, but we do not think error was committed in giving it. Contributory negligence is an affirmative defense, and the burden is upon the defendant to prove it, and it is usual to say in this connection: "Unless it is shown by the testimony of the plaintiff;" and since it is usual to express it in this way, it had been better if the instruction had so expressed it, but it does tell the jury that the burden is on the defendant to establish it "by the preponderance of the evidence in the whole case in order to prevent a recovery for that reason." This only means to tell the jury that, for that defense to avail, it must be proved by the preponderance of testimony, and that all the evidence in the case, both for plaintiff and defendant, tending to show it may be considered for that purpose. In other words, the burden is upon the party alleging it—the defendant—to prove it, but this burden may be discharged as well by the testimony of the plaintiff, if it shows it, as by the testimony introduced by the defendant, and we hold that no prejudicial error was committed in the giving of said instruction.

It is next strongly urged that the court erred in refusing to give appellant's requested instruction No. 10, and modifying it and giving it as amended. It reads:

"10. If you believe from the evidence that plaintiff lost his hold or balance on the pilot of the engine, or that his foot slipped off by reason of his failure to take precaution for his safety, which an ordinary prudent person similarly engaged would have done under like circumstances, then the railway company is not responsible for his injury, and your verdict should be for defendant."

This instruction was right, and should have been given without modification, but the amendment inserted by the court only tended to neutralize the effect of it; and if it had made it erroneous, no objection was made to the giving of it as amended, nor exception saved thereto. There was the statement of the engineer that the plaintiff said when he first

reached him after the injury, in explanation of it, that he slipped or fell off, and by the fireman, that he didn't know how it happened; but the chief question in the case was whether or not plaintiff was injured by the engine being started without any signal given by him to start it, causing the injury, and it was sufficiently covered by other instructions; and the instructions, as a whole, submitted this question fairly to the jury, and also the question as to whether he was guilty of contributory negligence in riding upon the pilot of the engine or at all while making the flying switch, and they found in favor of the plaintiff upon conflicting testimony.

The remarks of counsel in the closing argument are also assigned as error.

The attorney of appellee in the closing argument said: "But you know they get in a hurry. They want to get through. They have got to get through. They work all day and night. The law tries to limit them to 16 hours, but many a day they do and are required to work 24 hours. Sometimes they go to sleep. Sometimes they go off duty."

Objection being made, he said: "I am arguing why Parker was negligent, your Honor. If objected to, I will withdraw it; I know in this particular case they hadn't worked over 16 hours." The court said thereupon: "It's withdrawn," without any further direction or remonstrance.

In the further argument, although there was no testimony in the case relating to appellee's mother, he said: "Today she (referring to Claude Brown's mother) is hanging over that bedside. Here's the mother waiting with bated breath to hear what you say about her boy. She ought in justice to have her boy. She says: 'Bring me back my boy; bring him back to me in strength and young manhood; restore him to me if you can. Bring him back in his condition that he was in on the first day of January, 1910. Bring him back to me, oh, bring him back to me. Take back your gold; take back your money; give me my boy whole."

Objection was interposed. It was stated that appellee's mother was dead, and counsel then said: "Dead? Is she dead? I didn't know it. Then, gentlemen, she is in heaven watching the trial in this cause." There was no exception reserved to these remarks.

The statement of counsel relative to the employees working overtime was improper and unwarranted, but, upon objection made, it was immediately withdrawn by the attorney, who stated at the time that he knew in this particular case the employees had not worked over sixteen hours. The court also told the jury it was withdrawn, and no mention whatever was made thereafter of it, and the error committed in the making of the argument was thus effectively cured. The further argument relative to the solicitude of the boy's mother in heaven about what the jury would say of him cannot be complained of, since no exception was saved to it.

It is last urged that the verdict for $50,000 damages is so excessive as "appearing to have been given under the influence of passion or prejudice," and that the court erred in not granting a new trial on that account, and insisted that this court should reverse the cause for that reason. The verdict is the largest awarded by any jury for damages for personal injury within this State. The injury was most grievous one, not only incapacitating appellee from hoping to do any further work, but rendering him absolutely helpless, his lower body being paralyzed, dead in effect, offensive, loathsome. He suffered pain and was without hope of recovery, all agreeing the injury was fatal, and that he could not live more than six or seven years, and might not live more than one.

He was 22 years of age, bright and capable, had been but a short while in the company's service, and was earning at the time of the injury about $100 per month. Estimating his damage for the loss of time and earning capacity at that amount for the full time of his life expectancy, the total sum would not be more than $17,000. The proof showed another $1,000 say, for medical attention, medicines, bandages, etc. There was a possibility of promotion, with an increase of earning capacity, but the estimate does not take into consideration the possibility of loss of time and money by sickness, loss of position and decreased physical force with increasing years and old age.

The amount above the foregoing, $18,000, was given by the jury evidently to compensate for the pain and suffering of appellee since the injury until death should bring surcease. The verdict is clearly excessive, and the incompetent testimony of the father tending to show gross neglect of him by the hos-

pital physicians and attendants, notwithstanding it was withdrawn and the jury directed to disregard it, may have influenced them in fixing the amount of damages.

In *St. Louis, I. M. & S. Ry. Co.* v. *Webster*, 99 Ark. 265, the injured person was 35 years old at the time of the injury, in perfect health and free from bodily ailments or defects, had been in the railway service as a brakeman and conductor about 13 years, was working for defendant and had been only a short time, and earning $79 per month. The fall from a car caused a curvature of the spine, the whole body bending over towards the left side, bulging out on the right side, so that it was impossible for him to stoop or bend downward and pick up anything from the floor or ground. It resulted in the loss of his sexual power. He suffered great pain all the time and was unable to perform labor of any kind, was permanently injured and compelled to go through life, which would probably not be shortened because of the injury, a suffering, crooked, misshapen wreck, full of pain and without hope of a cure or permanent relief therefrom. The jury allowed $35,000 damages, and the court permitted it to stand, saying: "While the amount of the verdict seems to reach the limit, we cannot say that it is excessive. A man's life is permanantly wrecked, physically and otherwise."

The amount of the verdict in this case, beyond a reasonable and proper estimate for compensation for loss of time and earning capacity, indicates that the said incompetent testimony that was admitted and but mildly withdrawn by the court, without any remonstrance with or rebuke of counsel for persisting in its introduction, doubtless had effect to arouse the sympathy of the jury and cause the award of excessive damages.

The cause will not be reversed, however, because of the excessive damages appearing to have been given under said influence on that account, since the liability to compensate appellee for the injury sustained is established without reversible or prejudicial error, but a remittitur will be required.

In fixing the amount that appellee will be permitted to recover, the court will not be careful to see that it shall be sufficient to compensate for the injury sustained, but rather that the amount required to be remitted shall be large enough to strip the verdict of the jury of any prejudicial elements, giving ap-

pellant the benefit of reasonable probabilities in respect to the amount of the recovery, and reduce the judgment to an amount clearly regarded as not excessive, in accordance with the views announced in *St. Louis, I. M. & S. Ry. Co.* v. *Adams,* 74 Ark. 326. See also Sutherland on Damages, § 460; *Baxter* v. *Chicago & Northwestern Ry. Co.,* 80 N. W. (Wis.) 644; *Trow* v. *White Bear,* 80 N.W. (Minn.) 1117. Even this is a matter most difficult to determine.

There is no method for exactly estimating the effect of prejudicial testimony on the human mind, and correctly discerning a definite amount by which the verdict of a jury may be said to have been increased, on account of its effect. Neither is there a market where pain and suffering are bought and sold, nor any standard by which compensation for it may be definitely ascertained, or the amount actually endured determined. The same injury might produce more pain and suffering in a person of highly nervous organization than in one of more phlegmatic temperament.

The court, having in mind the condition met and the result of the possible prejudice to be eradicated, and also regard for all the elements that may properly enter into the amount of damages for an injury of this kind, as well as the time that the injured person may be required to endure the pain and suffering, which time in fact has been much reduced below the maximum estimate of the physicians, the appellee having died, and this cause been revived in the name of his administrator, has concluded that the amount of the judgment must be reduced to $25,000, to prevent the damages being excessive. The injury in this case and the resultant effects were as serious as could be inflicted upon a person in like condition with appellee, but they were not as great and could not produce so much suffering as in the Webster case already alluded to, where the span of life of the injured man was not shortened by the infliction of the injury upon him as here.

If a remittitur is entered reducing the judgment to $25,000 within fifteen days, it will be permitted to stand; otherwise the judgment will be reversed, and the cause remanded for a new trial.

Wood, J., (dissenting.) The rule of practice as to remittitur that prevailed in this court from its organization till

1882 was to allow a remittitur only in actions growing out of contract, or where there was damage to property and the value of the property furnished the exact measure of damage, and in such cases only where the remittitur could cure the only error committed. *Railway* v. *Hall*, 53 Ark. 7, and cases cited. In 1882 this court established the rule of allowing a remittitur in actions of tort as well as contract. But a remittitur was not allowed in actions of tort except in cases where the only error was an excessive verdict. *Little Rock & Fort Smith Railway Co.* v. *Barker*, 39 Ark. 491. Judge SANDELS in *Railway* v. *Hall* said that the rule established in *Little Rock & Fort Smith Railway Co.* v. *Barker, supra,* "is certainly the limit of the law."

Since the decision in *Little Rock & Fort Smith Railway Co.* v. *Barker,* this court, until the present time, has uniformly followed the rule established by that case, and has held that a remittitur would be allowed only in cases where the only error was the excessiveness of the verdict. *St. Louis, I. M. & S. Ry. Co.* v. *Waren,* 65 Ark. 628; *St. Louis, I. M. & S. Ry. Co.* v. *Adams,* 74 Ark. 326. In *St. Louis, I. M. & S. Ry. Co.* v. *Waren, supra,* Judge BATTLE, for the court, said: "The theory upon which a remittitur is allowed is that the appellant has no just complaint save that the damages are excessive." In *St. Louis, I. M. & S. Ry. Co.* v. *Adams, supra,* Judge RIDDICK for the court states the same proposition as follows: "Where the right to recover is clear, and has been established by the verdict of the jury, and where the errors committed in the trial *go only to the enhancement of the amount of the verdict, and do not affect the question of whether defendant is liable or not,* then, if the verdict be excessive or if, on account of improper evidence, or improper argument of counsel *tending to enhance* the amount of damages allowed, the court is not able to say from the evidence that the verdict is not excessive, and that the defendant was not prejudiced, in respect to the amount of the damages assessed, by such improper evidence or argument, the court may, in its discretion, name a sum which is clearly not excessive, and as a matter of grace to the plaintiff allow him to accept judgment for that amount, instead of a new trial."

In the case of *St. Louis, I. M. & S. Ry. Co.* v. *Waren, supra,* a child two and a half years old was run down by a train. Both

of his hands were cut off, and one leg and foot were so seriously injured that he could only move about by hopping. The evidence was conflicting on the question of appellant's liability. One of the attorneys for appellee in his argument said: "For almost that length of time (two years) the plaintiff in this case, poor and poverty-stricken, by changes of venue, by motions for continuances, and by those means known to those lawyers who undertake to conduct the railroad cases in this country"—at this point the defendant objected to the remarks, and the court said to the attorney. "There is an exception to your remarks." The attorney then continued: "I stand on the remarks. The record shows everything I have said. By those means, I say, and for that length of time they have succeeded in holding the plaintiff in this case in abeyance, but I am proud to say to you, gentlemen of the jury, today that we have them at last where they can shirk no longer by any means known to the law, and that we now have the privilege of presenting to a jury of twelve honorable and honest and impartial jurors this case, and the injuries to Ester Waren." Objection was made at the time to the remarks, but the court permitted the attorney to proceed and make the remarks to the jury as indicated. At the close of the attorney's argument, however, the court instructed the jury that the above remarks (calling the jury's attention specifically to them) were improper, and that they should pay no attention thereto. There was a verdict for $40,000. This court held in that case that the verdict was excessive, and that the remarks of counsel were prejudicial, notwithstanding the admonition of the court to the jury not to consider them, and reversed the judgment and remanded the cause for new trial. In refusing to allow a remittitur to be entered to cure the error of the improper argument Judge BATTLE announced the rule already quoted, and said further: "We can not say that the appellee's right to recover is free from doubt. The testimony is conflicting, and to assume that appellee had the unquestionable right to a verdict for some amount we would be compelled to hold that much of the evidence was entitled to no credence."

In the case of *St. Louis, I. M. & S. Ry. Co.* v. *Adams, supra,* there was no conflict in the evidence as to the facts.

The undisputed evidence showed clearly that the railway company was liable for the injury it had caused. The appellee in that case was permitted, over appellant's objection, to state that he had a family of ten or twelve to support, and that he did not receive much assistance from them in making crops." The court, through Judge RIDDICK, announced the rule already quoted from that case, and cited the former cases of *Little Rock & F. S. Ry. Co.* v, *Barker* and *St. Louis I. M. & S. Ry. Co.* v. *Waren.* The court consistently followed the rule in allowing a remittitur to cure the error in permitting the improper evidence, because the company was clearly liable as shown by the uncontroverted facts, and the only effect that the improper evidence could possibly have in such a case would be to unduly enhance the verdict.

In the case at bar there were two glaring errors that could not be cured by a remittitur according to the above rule so firmly settled by previous decisions of this court. The testimony of A. H. Brown, the father of appellee, as correctly set forth in the opinion, related to matters that were alleged to have occurred at St. Vincent's Hospital long after the injury, and while the appellee was there for treatment. Much of this testimony was the baldest kind of hearsay. For instance, the witness testified that he took it for granted from what the Sisters told him that a great deal of his son's pain and suffering while at the hospital was caused by the manner of his treatment there, and then he proceeded to describe the manner of that treatment, saying that his son told him "that he laid there on one side for 24 or 30, or even 35 hours—a day and two nights." Upon objection being made, the witness was allowed to answer a question as to the condition of his son while at the infirmary as follows: "I would go there in the morning, and they would let him lay there until the next morning without ever being dressed—24 hours—and he seemed to be in a great deal of pain and misery, with pains shooting down into his hips and thighs." This testimony was elicited by repeated questions from the attorneys for appellee to which objections were promptly interposed by the attorneys for appellant. But the court permitted it to go to the jury, and then finally instructed them not to consider any of it. The merest tyro in the law should have known that

this testimony from its very inception to its close was wholly irrelevant and incompetent, and that its only purpose was to arouse the sympathies of the jury for the distressful and awful condition of appellee after the unfortunate injury and to inflame their passions, and excite their prejudice against appellant for causing and allowing such conditions to obtain.

The testimony was such as to put the jury in a frame of mind that would make it improbable, to say the least, that they would give to the real evidence and law of the case that calm, deliberate and impartial consideration essential to a fair trial. The court concedes in the opinion that this testimony improperly influenced the jury. For, says the court: "The verdict is clearly excessive, and the incompetent testimony of the father tending to show gross neglect of him by the hospital physicians and attendants, notwithstanding it was withdrawn and the jury directed to disregard it, may have influenced them in fixing the amount of the damages." And again: "The amount of the verdict in this case, beyond a reasonable and proper estimate for compensation for loss of time and earning capacity, indicates that the said incompetent testimony that was admitted and but mildly withdrawn by the court, without any remonstrance with or rebuke of counsel for persisting in its introduction, doubtless had effect to arouse the sympathy of the jury and cause the award of excessive damages." In another part of the opinion the court says of the above testimony that "at most it could have had no injurious effect as against appellant, but to arouse sympathy or excite the prejudice of the jury against it in its award of damages."

The majority further conclude that, "having in mind the condition met and the result of the possible prejudice to be eradicated," etc., "the amount of the judgment must be reduced to $25,000 to prevent the damages being excessive."

Our statute provides that "the former verdict or decision may be vacated and a new trial granted, on the application of the party aggrieved, for any of the following causes, affecting materially the substantial rights of such party: Fourth: Excessive damages appearing to have been given under the influence of passion or prejudice." Kirby's Digest, § 6215. The verdict in the present case, being excessive in the enormous sum of $25,000, shows upon its face that it was the result of

passion and prejudice.  For such a large sum in excess in a personal injury suit could not have been the result of mere mistake or inadvertence.

The cause of the sympathy for appellee and of the prejudice against appellant that resulted in the excessive verdict is not far to seek.  It was produced by the incompetent and irrelevant testimony above mentioned, and further by the remarks of United States Senator Jeff Davis, who in his closing argument to the jury, speaking of the employees of appellant, said: "But you know they get in a hurry.  They want to get through.  They have got to get through.  They work all day and all night.  The law tries to limit them to 16 hours, but many a day they do and are required to work 24 hours.  Sometimes they go to sleep.  Sometimes they go off duty."  And, upon objection being made, he further said: "I am arguing why Parker was negligent, your Honor.  If objected to, I will withdraw it.  I know in this particular case they hadn't worked over 16 hours."  The court said thereupon: "It's withdrawn."  Here was an attorney occupying a high official position boldly stating as facts matters that were not in the record, and that he acknowledged himself, when objection was made, did not exist, but were argued by him, as he avowed, for the purpose of showing why Parker, the engineer, was negligent.

The rule of law requiring an attorney to confine himself in argument to the facts in evidence, and not to make of himself a witness in his argument, and state facts not borne out by the record, was never perhaps more flagrantly violated, and yet this outrageous breach of the proprieties and privileges of argument and violation of the rules of law was not even rebuked by the presiding judge in the presence of the jury that heard it.  The jury were not even directed to not consider it.  The court simply remarked: "It's withdrawn."  But such an egregious error could not be cured by the court with the simple remark:  "It's withdrawn."

We have set out the facts in the case of *St. Louis, I. M. & S. Ry. Co.* v. *Waren, supra,* and the prejudicial remarks of the counsel in that case.  The remarks in that case, to say the least, were certainly no more harmful in their effect upon the jury than were the remarks of counsel in this case.  More-

over, in that case the court specifically called attention to the remarks of counsel, and told the jury they were improper, and instructed them to pay no attention to them. Yet the court in that case refused to cure the error of the improper argument by a remittitur, but for that cause reversed the judgment, and remanded the cause for a new trial. That case presented a much stronger reason why a remittitur should be entered than this, for in that case there was only the improper argument calculated to arouse the passion and prejudice of the jury, but in the case at bar added to such improper argument was the admission of the improper and most damaging incompetent testimony above referred to.

Since the court has found that sympathy for the appellee and prejudice against appellant entered into the verdict rendered in this case, we are unable to see how it is possible for the court to determine that such sympathy and prejudice only influenced the jury to enhance the amount of the verdict. That might be true if there was no question as to the liability of appellant, but there was a sharp conflict in the evidence as to whether appellant was liable at all. There were only two witnesses to the occurrence, the appellee and the engineer of appellant. The testimony of the engineer tended to show that there was no negligence upon his part, while the testimony of appellee tended to show that there was. Motives for perverting the truth could not have been more powerful on the part of the engineer, who was a mere employee, than they were on the part of appellee, who was seeking a verdict for $50,000. If the sympathies and prejudices of the jury had not been wrought upon and stirred to the highest pitch by the improper methods above referred to, who can tell what their verdict would have been? It was within their province to have accepted the testimony of the engineer, rather than that of appellee, and but for these extraneous and improper influences they might have done so; at least it is not our province to say they would not have done so. Appellant had the right to have the question of its liability, as well as the amount of the damages, in case it was found to be liable, submitted to a jury whose minds were free from sympathy and from passion and prejudice. Every litigant has the right to a fair and impartial trial on every issue of fact in the case; and where

the evidence is conflicting on the issue of liability, it is not within the province of this court to take the question away from the jury and fix liability and the amount of the damages.

The statute conferring upon this court the power to render such a judgment as the circuit court should have rendered does not give it power to arbitrarily determine disputed questions of fact.   Neither the circuit court nor this court has such power as that.   Under our judicial system that is peculiarly the province of the jury.

The decisions of this court from *Walworth* v. *Pool,* 9 Ark. 394, 405, and *Sexton* v.*Brock,* 15 Ark. 345, 356, before the present statute, as well as the decisions since, have been to the effect that where there is a conflict in the evidence on the question of liability, and where passion and prejudice are manifest in the verdict, a new trial will be awarded.   *Kelly* v. *McDonald,* 39 Ark. 387, 393; *Texas & St. L. Ry. Co.* v. *Eddy,* 42 Ark. 527; *Springfield & M. Ry.* v. *Shea,* 44 Ark. 264; *Fordyce* v. *Nix,* 58 Ark. 139.

In such cases a remittitur will not be allowed to cure the verdict; for, where there is a conflict in the evidence as to liability, it can not be said that passion and prejudice did not enter into the finding of the jury on that question as well as in the amount of the verdict. · *St. Louis, I. M. & S. Ry. Co.* v. *Waren,* 65 Ark. 620, 628.   See also *Railway* v. *Hall,* 53 Ark. 7; *Little Rock & F. S. Ry. Co.* v. *Barker,* 39 Ark. 491.

Not only has this been the rule heretofore in our State, but, as observed by Mr. Justice SANDELS in *Railway* v. *Hall, supra,* it is "prevalent in most of the States" of this Union.

The rule and the reason for it, as it exists in nearly all the States, is well stated in *F. M. Davis Iron Works Co.* v. *White,* 31 Col. 82, as follows:

"Where, in an action for personal injuries, and others standing on like grounds, a verdict is excessive, and was returned as a result of passion or prejudice upon the part of the jury, it should be set aside in its entirety, and a new trial awarded; and that it is beyond the power of a trial court to order a remittitur as to the part which it deems excessive and enter judgment for the residue, because the entire verdict is vitiated by the improper motive, and it is impossible for the court to

determine that any particular part is free from objection and some other part bad."

And also in *Burdict* v. *Missouri Pacific Ry. Co.*, 27 S. W. 453, as follows:

"If it can be seen, and fairly said, the jury gave the excessive verdict by reason of prejudice, passion or any other improper method, a new trial should be awarded, for the inference would be a fair one that the finding for the plaintiff was also brought about by improper influences, and this is especially so when there is any doubt as to the right of the plaintiff to recover."

The rule is "ancient of days," "full of wisdom" and of almost universal application. It can not be ignored without doing great injustice to any party entitled to invoke it. A failure to apply the rule in the present case, in our opinion, necessarily overrules *St. Louis, I. M. & S. Ry. Co.* v. *Waren,* 65 Ark. 628, *Railway* v. *Hall,* 53 Ark. 7, and *Little Rock & F. S. Ry. Co.* v. *Barker,* 39 Ark. 491, and many previous decisions of this court. It is a dangerous precedent that will surely encourage a recurrence of similar methods in many future trials, and besides it denies to appellant that fair and impartial trial vouchsafed to every litigant by the Constitution and statutes of our State. We feel constrained therefore to dissent.

HART, J., concurs.