[Civ. No. 2789.   Third Appellate District.—December 2, 1924.]

VIOLA MASSEY, as Administratrix, etc., Respondent, v.
  SOUTHERN PACIFIC COMPANY (a Corporation),
  Appellant.

[1] NEGLIGENCE—ACTION FOR DEATH OF RAILROAD BRAKEMAN—MOVE-
    MENTS OF DECEASED AT TIME OF ACCIDENT — EVIDENCE — INFER-
    ENCES.—In this action under the Federal Employers' Liability Act
    for damages for the death of plaintiffs' intestate, a railroad
    brakeman, as the result of an accident occurring while he was in
    the act of coupling cars in a freight train operated by defend-
    ant, the evidence in the case, particularly that showing that when
    the slack in the coupling was taken up the deceased crumpled up
    and fell backward, that he was lying with his head (the farthest
    removed portion of his body) from the rails and that both of his
    feet were outside of the rails, justified the jury in drawing the
    inference that at the time of the injury in question the de-
    ceased was neither moving forward nor backward, but was stand-
    ing, engaged in some act considered by him necessary to effect the
    coupling at the instant of his death.

[2] ID.—VIEW OF CAR-COUPLER—INFERENCES BY JURORS.—During the
    course of the trial of such action, upon stipulation and consent
    of both parties, the jury having been given an ocular demonstra-
    tion of the car-coupler in question, the height of the car, the

---

2. Impression made on mind of jury by view as evidence, note,
10 Ann. Cas. 663.

position a person's body would assume when in the act of using the coupling lever, the jurors had a right to draw their own inferences and conclusions from the facts thus presented to them.

[3] ID.—IMPROPER LOADING OF CAR—EVIDENCE—I..FERENCES.—In such action, the evidence having shown that immediately after the accident there was a timber a few inches in width projecting eighteen inches over the end of the flat car which the deceased was coupling to another car, contrary to the rules and constituting a continuing and constant peril while in that condition to anyone coupling or uncoupling that car from any other portion of the train, and there having been no evidence showing that the car was not in that condition when it left the point of shipment or that the load had shifted during the course of its travels to the point where the accident occurred, and the evidence as to the manner in which the train was moving at the time of the accident having been such as to justify the inference that the impact of the cars at the time of the accident had not caused any shifting of the lumber on the flat car, there is no merit in defendant's contention that there was no evidence showing either negligent, unskillful, or careless loading of the lumber on the car in question.

[4] ID.—DUTY TO MAKE INSPECTION — RULES — EVIDENCE. — In such action, the jury having had before it the printed rules of the defendant railroad company and, also, the parol testimony of one witness for the defendant as to the existence of some of the rules, it was within their province to determine the fact of whether there were or were not any rules requiring brakemen, rather than the conductor, to make inspection of the cars as to their being properly loaded.

[5] ID.—CONTRIBUTORY NEGLIGENCE—DIMINISHED DAMAGES.—In such an action under the Federal Employers' Liability Act, where there is any testimony showing negligence on the part of the defendant, contributory negligence on the part of the plaintiff does not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to the plaintiff.

[6] ID.—ASSUMPTION OF RISK—IMPROPER LOADING OF CAR—DUTY TO OBSERVE—PROVINCE OF JURY.—If the lumber-laden car and the refrigerator-car which the deceased had undertaken to couple together had been in their usual and ordinary condition, the deceased would have assumed all the usual and ordinary risks incident upon the dangers of his employment and defendant would have been relieved from liability; but, the lumber-laden car not

5. Comparison of negligence under Federal Employers' Liability Act, note, Ann. Cas. 1914C, 175. See, also, 18 R. C. L. 828; 16 Cal. Jur. 1093.

6. See 18 R. C. L. 830.

having been so loaded, it was a question of fact for the jury to determine whether the projecting beam was such an apparent and obvious danger that the deceased, by the exercise of ordinary care, would have observed the same in time sufficient to enable him to escape injury.

[7] ID.—CARE REQUIRED OF EMPLOYEE—DUTY TO INSPECT CARS—INSTRUCTIONS.—In this action under the Federal Employers' Liability Act for damages for the death of plaintiff's intestate, a railroad brakeman, as the result of an accident occurring while he was in the act of coupling cars in a freight train operated by defendant, the jury was properly instructed that "The plaintiff is required to use ordinary care for his own safety, but this does not include inspection of the cars and appliances for defects; that duty being upon the defendant and the law permitting the plaintiff to rely upon the defendant for the performance of that duty for his safety. The plaintiff is only required, in the exercise of ordinary care, to take notice of such defects and dangers as are patent to ordinary observation without the inspection which the law requires at the hands of the defendant."

(1) 17 C. J., p. 1310, n. 36.   (2) 38 Cyc., p. 1841, n. 18.   (3) 26 Cyc., p. 1445, n. 85.   (4) 26 Cyc., p. 1472, n. 49.   (5) 29 Cyc., p. 561, n. 34.   (6) 26 Cyc., p. 1478, n. 77.   (7) 26 Cyc., p. 1162, n. 68.

APPEAL from a judgment of the Superior Court of Butte County. H. D. Gregory, Judge. Affirmed.

The facts are stated in the opinion of the court.

George F. Jones and Devlin & Devlin for Appellant.

Carr & Kennedy and Raymond A. Leonard for Respondent.

PLUMMER, J.—On or about the sixteenth day of August, A. D. 1920, Arthur Ralph Massey, while employed as a swing brakeman by the Southern Pacific Company, met his death in the course of his employment, and this action was begun and prosecuted under the Federal Employers' Liability Act, by his widow, as the administratrix of the estate of said deceased to recover damages. Plaintiff had judgment and the defendant appeals.

7. Constitutionality, application and effect of the Federal Employers' Liability Act, note, L. R. A. 1915C, 47.

The record shows that the train on which the deceased was employed was made up by a switching crew, under the direction of a yardmaster in the railroad yards of the defendant at the town of Chico. Included in the train was a car of lumber from Lamoine in the county of Shasta, destined for a point outside of the state of California. The train crew consisted of a conductor in charge of the train, engineer, fireman, and three brakemen, of which the deceased was one. This train crew took the train out of Chico and proceeded to the town of Durham, in the county of Butte. While engaged in the yards at Durham, in the act of assisting in coupling a refrigerator-car to the lumber-car mentioned, the deceased was caught between the refrigerator-car and a piece of lumber, which extended about eighteen inches over the end of the flat car on which the lumber was loaded, his head crushed and instantly killed. The record shows that immediately preceding this incident the deceased rode on the stirrup on the end of the refrigerator-car next toward the lumber-car which the train was approaching; that the approaching cars consisted of a cut of four in number to which the engine was attached and was being taken up to within a very few feet of the lumber-car, the distance being given by different witnesses as from two to two and one-half feet, when the deceased stepped from the refrigerator-car to make the coupling from the side of the car on which he was riding; that the deceased disappeared from the view of two witnesses who were not very far away, and immediately after the cars came together was seen to fall suddenly to the ground, falling back from the cars. The deceased, as one witness expressed it, did not fall directly; he collapsed, his knees bent under him before his body hit the ground. The entire body, including the feet of the deceased, was outside the outer rail of the track as the deceased lay on the ground immediately after his fall. His head was away from the track. An examination of the car immediately after the accident revealed that the deceased had been struck on the head by a projecting beam of lumber on the right-hand side of the Lamoine lumber-car. The car of lumber had been hauled over this road from Lamoine in Shasta County across a strip of mountain grades through the Sacramento Canyon before it was placed in the train in Chico. The line from Chico to the place of the accident herein referred to was

practically straight. The complaint in the action alleges that the car of lumber was, without the knowledge of the plaintiff, negligently, carelessly, and unskillfully loaded and was loaded contrary to the C. L. loading rules in force on the defendant's line governing the loading of lumber on freight-cars, in this, that the lumber loaded on said car extended about eighteen inches from the end of the car to which the deceased, Massey, was required to make the coupling referred to, leaving not more than five inches clear between the end of said projecting beam of lumber and the refrigerator-car at the time the coupling was made. It is further alleged that the deceased had no knowledge, notice, or warning of the manner in which the car was loaded, etc. It is further alleged that the manner in which said car was loaded was through the negligence and carelessness of the defendant rendered unsafe for brakemen and other employees on the train. It further appears from the transcript that the deceased's duty, as a swing brakeman, required him to assist in switching, coupling, and uncoupling of freight-cars of all kinds being moved by the defendant over its lines and carried on the train upon which he was engaged as a brakeman.

On the part of the defendant the death of the deceased and the fact of his having been killed by the projecting beam of lumber are admitted, and then, by way of defense, it is alleged that the deceased came to his death by his own negligence, and also, as a further defense, alleged that injuries resulting in the death of said Massey were the result of a risk incident to the business in which he was employed, and of which he had full knowledge at the time he received the same, and that the said deceased voluntarily and with knowledge assumed said risk.

The transcript shows that the cars about to be coupled were equipped with a Climax automatic coupler; that these couplers were operated by levers which extended to within about six inches of the outside of the cars; that the lever feasible to be operated by the deceased at the time of the coupling was on the car loaded with lumber; the lever operating the coupler on the end of the refrigerator-car was on the opposite side of the car from that on which the deceased was riding. It further appears that for this coupler to operate, the knuckles must be open, and if the knuckles are open and the cars come together, the coupling will be made;

70 Cal. App.—6

if not open the coupling will not be made, and that to disengage these knuckles and allow them to be opened, a certain pin must be lifted. This pin is lifted by means of raising up the lever to which we have referred, and this, in turn, operates another lever which acts upon a fulcrum, and lifts the pin, disengaging the knuckles of the coupler. So far as the testimony goes it would appear that the coupler, including the knuckles on both cars, were in good working order at the time the coupling above referred to was about to be made. As stated heretofore, just before the cars came together, the deceased left his position, from where he had been riding on the stirrup of the refrigerator-car and disappeared from view and immediately after the slack of the coupling cars had been taken up, dropped on the ground as hereinbefore stated.

[1] It is the contention of the plaintiff that the deceased was in the act of operating the lever to which we have referred, that his head was brought on a level with the projecting beam of lumber, and that at the instant of the coupling he was impaled between the same and the refrigerator-car and thus met his death.

On the part of the defendant and appellant, it is urged that the decedent went entirely in between the cars and attempted to adjust the knuckles, disengage the pin to which we have heretofore referred, or perform such other act as to him appeared necessary to effect the coupling of the cars, and that in going there between the cars he was caught by the projecting beam. The physical facts, as disclosed by the testimony, would seem to contradict the assumption that the deceased ever reached the coupling bars. It is true witnesses alongside of the train state that the deceased disappeared from their view. The testimony shows that the cars involved were some eight feet in width, and projected on either side beyond the rails, and hence, if the position of the respective witnesses was near the side of the train, the angle of light or vision would be such that the deceased might very well have disappeared from view without having reached the center of the track where the coupling bars would ordinarily be on the cars about to be coupled. The testimony shows that the deceased crumpled up and fell backward, that he was lying with his head, the farthest removed portion of his body, from the rails and that both of his feet

were outside of the rails. From this fact the inference may readily be drawn that at the time of the injury in question the deceased was neither moving forward nor backward, but was standing, engaged in some act considered by him necessary to effect the coupling at the instant of his death.

[2] During the course of the trial, upon stipulation and consent of both parties to the action, the jury was given an ocular demonstration of the coupler in question, the height of the car, the position a person's body would assume when in the act of using the coupling lever, to which we have referred, and under the stipulation of counsel, had a right to draw their own inferences and conclusions from the facts thus presented to them.

The testimony also shows that the couplers in question require the exertion of considerable strength to operate, that they are necessarily heavy; that the pin which holds the knuckle in place is a rough piece of iron and requires considerable pressure to move. After describing the operation of the coupler in question, and the different levers by which the coupler is operated, and its position upon cars such as the one here involved, and the position which a man's body would assume when in the act of operating the coupler, and being questioned about the same as to the position which the deceased would have occupied at the time of operating or in attempting to operate the coupler by the use of the lever on the car loaded with lumber, one of the witnesses (the conductor) was asked the following question: "Q. And that is the natural movement for him to take. Now with that lever six inches inside of the edge of this car and at a lower angle than this is here, the movement naturally brings his body, the upper portion of his body and his head inside between the cars doesn't it—that is the natural position for him to take if he is working rapidly as a man will work on a moving train? A. Yes, sir." The testimony further shows that the sill of the flat car in question was from eight to ten inches in thickness, that, in addition to this sill, the floor of the flat car was sufficient in thickness to give a distance of at least twelve inches from the lower part of the projecting beam to the staple or container which holds in place the lever operating the automatic coupler; that the automatic coupler was some twenty-nine or thirty inches from the top of the rail; that the rail was some four to six inches in

height; whether there was any depression between the ties or ground upon which the deceased was standing does not appear. It is upon these facts that the plaintiff bases her contention that in reaching down to take hold of the lever and draw it upward that the deceased brought his head to a level between the projecting beam and the approaching refrigerator-car. We have recited the facts thus fully in order to set forth the basis justifying the inference to be drawn that the deceased came to his death in the manner alleged by the plaintiff.

The appellant set forth the following testimony by the witness Fiser: " . . . and the last I saw of Mr. Massey when he was alive, I saw him right by me on the corner of the car, the fourth car from the engine, and as he went by he spoke to me . . . and the next I noticed was when the cars stopped moving, and as customary, at that time I looked to see if there was any signals given to see whether he wanted to back up there or go ahead, after the coupling was made; and at that time I saw Massey fall from between the two cars and I immediately went to his side and had the engineer cut off the engine. . . . I found Massey lying on the ground with his head away from the track, clear from the track and the cars. . . . I did not see him go in between and I didn't see how he was there. I merely saw him fall from between the cars and I was not looking up until that time."

Also the testimony of a brakeman to the effect that Massey disappeared from his view and he gave the engineer a stop-signal, and, also, the testimony of the engineer to the effect that Massey had given him an "easy" signal; that he could see the cars toward which he was backing, or could see the shadow of them; that just as he came within two and one-half feet of the coupler, Massey stepped between the cars, and that he had already applied the independent brakes when about to make the coupling, but he did not have time to apply the automatic, and that the deceased fell out to one side, and upon this testimony, insist that nothing was left for the jury upon which to base any conclusion other than that the deceased had gone in between the cars for the purpose of adjusting with his hands the knuckles and pin on the coupler to which we have referred; that, in so doing, he was violating a rule of the company, was performing an act

of negligence, and, also, assumed all the risks incident to making a coupling in that manner, and upon these premises, bases in part its argument for reversal herein. As we have seen, the location of the appliances controlling the couplers, the height of the cars, the position of the projecting beam, the width of the cars, the position of the deceased outside of the rails, the demonstration given to the jury, the position which one would ordinarily assume in an attempt to operate the coupling by the controlling levers, were all placed before the jury, and we think such facts sufficient to justify the inferences that the deceased came to his death in the manner contended for by the plaintiff, and that the death of the deceased brought about in this manner, was not inconsistent with the expressions of the conductor and the engineer that the deceased fell from between the cars, and that the mere fact that two witnesses testified that the deceased disappeared from their view between the cars cannot be said to be a controlling factor. The positions of the witnesses were not given. We may reason that the engineer was sitting in his cab and his line of vision would be the outside line of the cars on his side of the train and from the fact that the cars projected over the track, the deceased could very well have been found by the jury to have disappeared from his view and still found not to have gone between the rails in operating or attempting to operate the coupler by his hands instead of using the levers with which the cars were equipped.

The testimony shows that the projecting beam was flush with the outside of the flat car on the side of the train where the deceased met his death, from which the jury might have concluded that had the deceased been attempting to operate the coupler with his hands, he would have been entirely beyond the line of peril caused by the approaching beam and his death would not have been then and there caused. In other words, the deceased would have been between the projecting beam and the coupler where there would have been plenty of space for his body.

[3] The argument is next made that there is no testimony showing either negligent, unskillful, or careless loading of the lumber on the car in question. The rules relating to the loading of lumber on flat cars require that there shall be no projecting timbers. There was a projecting timber a few inches in width and eighteen inches in length over the end

of the flat car contrary to the rules and constituted a continuing and constant peril while in that condition to anyone coupling or uncoupling that car from any other portion of the train. No one testified that the car was not in that condition when it left Lamoine where it was loaded, nor testified that the lumber had shifted during the course of its travels from Lamoine to the side-track at Durham. One of the brakemen who inspected the car of lumber after the injury of the deceased testified "that it was a ragged load." We think the jury had a right to infer from the evidence that the timber was found projecting and from the testimony which we have just quoted that the car was negligently loaded, as alleged in the complaint. It is insisted that the lumber may have shifted by the impact of the cars coming together at the instant the deceased was killed. This conclusion, however, could not have been very well reached by the jury from the inference they were entitled to draw from the testimony of the engineer that he was moving backward at the rate of from only one mile to two and a half miles per hour; that he had been given an easy signal and had already applied the independent brake. There is no testimony of any violent impact and from this and the testimony of other witnesses· that the train was moving very slowly, we think the jury had the right to draw the inference that the impact at the time of the killing of Massey had nothing to do with the shifting of the lumber on the flat car. Notwithstanding the condition and danger presented by the load of lumber at the time in question, the appellant insists there is no liability; that the deceased himself was negligent and also assumed all the risks presented by the condition of the car which we are considering.

Rule 813 of the defendant is as follows: "The general direction and government of a train is vested in the conductor, and all persons employed on the train will obey his instructions. . . . He must be vigilant and cautious, and not trusting alone to rules and signals for safety."

Rule 865 provides: "Conductors must not take freight either in carloads, or less than carload lots from a station where there is an agent without the regular way bills or card bills, nor if the cars are in his opinion unsafely loaded."

In this particular, and as relating to his duty to inspect the train, the testimony of the conductor is as follows: "Q.

When you took that train at Chico—I will ask you this question—when prior to that time had you seen that lumber projecting over the car? A. I had not seen it prior to that time. Q. Did you make any careful inspection of the car at Chico? A. I merely—merely to walk by my train and take the number of my cars and casually looking over the whole train to see if there was anything out of the ordinary. Q. You are not in a position to say how long that piece of lumber had been projecting over the end of that car? A. No, sir; I do not. . . . Q. Did you inspect the train when you left Chico? A. The normal inspecting in doing it, the normal inspecting in taking it and looking over the cars for any defect that I might see. I made no accurate inspection— Q. (Int.) Speak slowly so we can understand you—did you inspect that train before you left Chico? A. Well, what I would see of the train by glancing over it." Only one conclusion is possible to be drawn, and that is, he made no inspection whatever. "Glancing over it" does not come within the law or the spirit of what is meant by inspecting a train to ascertain whether any part of its loading is dangerous to life, limb, or property. The jury had a right from this testimony to draw the conclusion that the train went on its way southward from Chico to the point where the deceased met his death without any inspection whatsoever. To offset this testimony, the appellant introduced the testimony of the trainmaster to the effect that there were supplemental rules contained in a timetable, by which the duty was imposed upon brakemen to examine the brakes, the running gear and draft rigging as the cars passed by them, and also the condition of the load on passing cars. The testimony does not show, however, that these rules were brought home to the deceased, but it does show that there was nothing in the whole scope of the book of rules which devolved this duty upon brakemen. In this relation, the following testimony appears in the transcript: "Q. Is there anything in the whole scope of that book of rules furnished by the Southern Pacific Company for the brakeman to carry with him in which it says that he has any duty whatsoever with respect to the inspection of the cars as to their being properly loaded? A. No, sir; only what instructions that are given when they employ a man."

It is strongly insisted by the respondent that the testimony of this witness as to supplemental rules from the time-tables was inadmissible from the fact that there is nothing to show that these rules were brought to the attention of the brakeman, other than that he might have had a timetable, and, also, that they were not included within the book of rules furnished brakemen for their guidance and conduct in the handling of trains. It is also further insisted that the rules being alleged to have been printed, such rule or rules should have been presented to the jury by producing the same, instead of by way of parol testimony. This, of course, is true, but we do not need to pass upon this objection, or the admissibility or inadmissibility of the testimony in question from the fact that the jury had the witnesses before them, and it had the privilege of accepting the printed rules of the company or the parol testimony of the witnesses. That being within the exclusive province of the jury, and having been resolved in favor of the plaintiff by the jury, it becomes wholly immaterial whether or not the testimony of the witnesses in question should have been excluded.    [4] In other words, the jury had before it the printed rules of the company, and, also, the parol testimony of one witness as to the existence of some of the rules, and it was within their province to determine the fact of whether there were or were not any rules requiring brakemen, rather than the conductor, to make inspection. The printed rules cast the duty upon the conductor alone. The parol testimony of the witness referred to was to the effect that this duty was shared by the deceased brakeman. Even though the parol testimony is alleged to be uncontradicted, it does not, under such circumstances, take away from the jury the question of fact as what were the rules.

[5]    Where there is any testimony showing negligence on the part of the defendant, it is conceded that, under the Federal Employer's Liability Act, contributory negligence on the part of the plaintiff does not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. (35 U. S. Stats. at Large, 65, c. 149, sec. 8657 (Comp. Stats. 1913); *Illinois C. R. Co.* v. *Skaggs,* 240 U. S. 68 [60 L. Ed. 528, 36 Sup. Ct. Rep. 249, see, also, Rose's U. S. Notes].)

[6]   Was the assumption of risk by the plaintiff such as to relieve the defendant from liability? In *McAfee* v. *Ogden Union Ry. & Depot Co.,* 62 Utah, 120 [218 Pac. 100], the rule as to the assumption of risk is thus stated: "Under the rulings of the United States Supreme Court an employee of a railroad engaged in interstate commerce, whether he is actually aware of them or not, assumes such damages and risks as are ordinarily incident to the employment. And he also assumes the risks due to the negligence of his employer when he becomes aware of the defect and the risk arising from it, or when such defects and risks are so open and obvious that an ordinarily prudent person would have observed and appreciated them, and then continues in the service without complaint. (*Gila Valley & G. N. R. Co.* v. *Hall,* 232 U. S. 94 [58 L. Ed. 521, 34 Sup. Ct. Rep. 229]; *Seaboard Air Line* v. *Horton,* 233 U. S. 492 [Ann. Cas. 1915B, 475, L. R. A. 1915C, 1, 58 L. Ed. 1062, 34 Sup. Ct. Rep. 635]; *Texas & Pacific R. Co.* v. *Swearingen,* 196 U. S. 51 [49 L. Ed. 382, 25 Sup. Ct. Rep. 164]; *Choctaw, O. & G. R. Co.* v. *McDade,* 191 U. S. 64 [48 L. Ed. 96, 24 Sup. Ct. Rep. 24]; *Union P. R. Co.* v. *O'Brien,* 161 U. S. 451 [40 L. Ed. 766, 16 Sup. Ct. Rep. 618]; *Schlemmer* v. *Buffalo R. & P. R. Co.,* 220 U. S. 590 [55 L. Ed. 596, 31 Sup. Ct. Rep. 561, see, also, Rose's U. S. Notes].)" In the case of *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Webster,* 99 Ark. 265 [Ann. Cas. 1913B, 141, 137 S. W. 1103, 1199], bearing upon the assumption of risks, the court said: "The elementary rule is that it is the duty of the employer to furnish appliances free from defects discoverable by the exercise of ordinary care, and that the employee has a right to rely upon this duty being performed, and that whilst in entering the employment he assumes the ordinary risks incident to the business, he does not assume the risk arising from the neglect of the employer to perform the positive duty owing to the employee with respect to appliances furnished. . . . The employer, on the one hand, may rely on the fact that his employee assumes the risk usually incident to the employment. The employee on the other has the right to rest on the assumption that appliances furnished are free from defects discoverable by proper inspection, and is not submitted to the danger of using appliances containing such defects because of his knowledge of the general methods

adopted by the employer in carrying on his business, or because by ordinary care he might have known of the methods, and inferred therefrom that danger of unsafe appliances might arise. The employee is not compelled to pass judgment on the employer's methods of business or to conclude as to their adequacy. He has a right to assume that the employer will use reasonable care to make the appliances safe and to deal with those furnished relying on this fact, subject of course to the exception which we have already stated, by which where an appliance is furnished an employee, in which there exists a defect known to him or plainly observable by him, he cannot recover for an injury caused by such defective appliance, if, with the knowledge above stated, he negligently continues to use it.''

It is strongly insisted by appellant that the circumstances connected with this case show, conclusively that the deceased assumed all the risks incident to making the coupling between the refrigerator-car and the lumber-laden car. This, we think, is true, in so far as it applies to cars in their usual and ordinary condition. If the flat car loaded with lumber had been in the usual and ordinary condition of such cars, and the lumber thereon had been in the usual and ordinary condition, as required by the rules relating thereto, then, and in that case, the plaintiff would have assumed all the usual and ordinary risks incident upon the dangers of such employment. We think it a question of fact for the jury to determine whether the projecting beam was such an apparent and obvious danger that the deceased, by the exercise of ordinary care, would have observed the same in time sufficient to enable him to escape injury. The fact that he may have observed the projecting beam of lumber after it was too late to save himself would not relieve the defendant from liability. In this particular it may be stated that no other member of the train crew appears to have known of the projecting beam until after the death of the swing brakeman. The conductor, whose duty it was, as we have seen, to inspect the cars, was wholly ignorant of the dangerous condition of the flat car, and, under these circumstances, it cannot be said as a matter of law that the deceased assumed the risks, dangers, and hazards presented, which resulted in his death at the time in question. We do not deem it necessary to review the authorities cited upon the question of negligence and

upon assumption of risk cited by counsel for the reason that they are practically in accord with those to which we have hereinbefore referred.

[7] Objection is also made to instruction No. 9, given by the trial court to the jury. That instruction reads as follows: "The plaintiff is required to use ordinary care for his own safety, but this does not include inspection of the cars and appliances for defects; that duty being upon the defendant, and the law permitting the plaintiff to rely upon the defendant for the performance of that duty for his safety. The plaintiff is only required, in the exercise of ordinary care, to take notice of such defects and dangers as are patent to ordinary observation without the inspection which the law requires at the hands of the defendant." This instruction is identical with the one given in *St. Louis etc. Ry. Co.* v. *Webster, supra,* and is, although worded differently, practically the same as the rule of law set forth in the case of *McAfee* v. *Ogden Union Ry. & Depot Co., supra,* quoting from decisions of the United States supreme court. The objection to the instruction concerning the age of the widow appears to have been made through a misapprehension of counsel, in that the record shows that the age of the widow was stipulated. While the question of the amount of damages is alleged to have been excessive in defendant's motion for a new trial, no argument is made thereon, and, as that point is not presented for our consideration in appellant's briefs, we think it unnecessary to consider the same.

The judgment of the trial court is affirmed.

Hart, J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on December 31, 1924, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 29, 1925.

All the Justices present concurred.